[No. A100659. First Dist., Div. Two. Nov. 12, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
JERRY MARK STEWART, Defendant and Appellant.

244

COUNSEL

Donald L. Lipmanson for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Rene A. Chacon and Linda M. Murphy, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

KLINE, P. J.—

## INTRODUCTION

Jerry Mark Stewart appeals from a conviction of possession of methamphetamine for sale. Following the trial court's denial of his motion to suppress, appellant entered a plea of no contest to the charge. He contends the trial court erred in ruling he lacked "standing" to challenge the search. We will reverse the judgment and remand.

## STATEMENT OF THE CASE

On September 26, 2001, the People filed an information charging appellant with possession of methamphetamine for sale (Health & Saf. Code, § 11378). Shortly thereafter, appellant filed a motion to suppress evidence pursuant to Penal Code section 1538.5, which was denied on December 7, 2001. On August 22, 2002, pursuant to a plea bargain that was placed on the record (*People v. West* (1970) 3 Cal.3d 595 [91 Cal.Rptr. 385, 477 P.2d 409]), appellant entered a plea of no contest. He was sentenced on October 24, 2002, to three years' probation and 60 days in county jail, execution of which was suspended pending the resolution of issues on appeal.

## STATEMENT OF FACTS

Sergeant Smith of the Mendocino County Sheriff's Office testified at the preliminary hearing that at about 2:25 p.m. on April 23, 2001,[1] he and

---

[1] All dates hereafter are in 2001.

another officer arrived at 42250 Covelo Road in Willits to conduct a probation search of Patrick Unangst. After examining a trailer home located on the property, Smith went to the main residence and found the front door open. Announcing several times that he was from the sheriff's office and wished to conduct a search, Smith knocked on the open door and entered the house.

The first person Smith encountered was appellant's wife, Velda Stewart. Without attempting to block his entry, she told Smith she was doing laundry and no one else was in the house. During the conversation, Smith heard noise coming from the lower floor. Without interference, Smith went downstairs. Again announcing he was a deputy sheriff there to conduct a search, Smith entered an unlocked room. In the room he found Michael Hamel sitting on a single bed and appellant standing near a dresser. At Hamel's feet was a baggy of what appeared to be methamphetamine, which Smith collected. When Hamel stood up the officer noticed a bulge in the mattress. Beneath the mattress Smith found methamphetamine as well as drug paraphernalia, all of which he also seized.

Smith testified that, after he arrested all three occupants of the house, appellant told him that his wife had seen the officer walk onto the property and immediately declared "the cops are here." Appellant said he and Hamel quickly left the living room and went downstairs. Smith testified that he did not believe appellant lived in the main residence.

At the hearing on the motion to suppress, Harry Unangst (Unangst), the owner of 42250 Covelo Road, testified that there were three residences on the property: the main residence, in which Unangst resided; and two mobile-homes, one of which was occupied by appellant and his wife, and the other by Unangst's son Patrick. Unangst stated that appellant's access to Unangst's residence was "[u]nlimited, [he was] free to come and go as he pleased." Appellant normally used Unangst's residence "on a daily basis"; he would come "to visit and socialize, watch T.V.," use the facilities, and "was free to do anything he wanted; laundry or anything like that in the house." Appellant was not obliged to knock before entering, "but he normally did it as a courtesy." Appellant had been given the keys to the house four or five years earlier and possessed them at the time of the search. Appellant and his wife regularly cooked their meals in Unangst's house and showered in his bathroom. When Unangst was present, appellant and his wife slept in their mobilehome.

Unangst testified that he and his wife were gone from their home between April 18 and April 24. Appellant had permission to stay in the house overnight while they were away and prevent others from entering the

premises. Unangst did not give appellant or anyone else permission to sell drugs in his house. When he left home on April 18, Unangst locked the house.

In the course of concluding that appellant lacked "standing" to challenge the search, the trial court stressed that although appellant had unlimited access to the house, and did not need to knock before entering but did so as a courtesy, there was no evidence that he had a "residential interest" in the premises "so as to have an expectation of privacy." The court also emphasized the absence of evidence that appellant stored clothes or other personal items at the house other than methamphetamine. Finally, acknowledging appellant had permission to stay overnight and exclude others when the owner was absent, the court believed it significant that appellant had not shown he actually exercised these privileges.

## DISCUSSION

"An appellate court's review of a motion to suppress evidence is . . . governed by well-settled principles. The trial court's factual findings relating to the challenged search or seizure, 'whether express or implied, must be upheld if they are supported by substantial evidence.' (*People v. Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621].) ' "The trial court also has the duty to determine whether, on the facts found, the search was unreasonable within the meaning of the Constitution." (*Ibid.*) Because "that issue is a question of law," the appellate court is not bound by the substantial evidence standard in reviewing the trial court's decision thereon. Rather, . . . in such review it is "the ultimate responsibility of the appellate court to measure the facts, as found by the trier, against the constitutional standard of reasonableness." (*Ibid.*) On that issue, in short, the appellate court exercises its independent judgment.' (*People v. Leyba* (1981) 29 Cal.3d 591, 597 [174 Cal.Rptr. 867, 629 P.2d 961], fn. omitted, quoting *People v. Lawler, supra*, 9 Cal.3d at p. 160.)" (*People v. Loewen* (1993) 35 Cal.3d 117, 123 [196 Cal.Rptr. 846, 672 P.2d 436].)

"The Fourth Amendment guarantees '[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures' by police officers and other government officials. (U.S. Const., 4th Amend.) The touchstone of Fourth Amendment analysis is whether a person has a constitutionally protected reasonable expectation of privacy, that is, whether he or she has manifested a subjective expectation of privacy in the object of the challenged search that society is willing to recognize as reasonable." (*People v. Robles* (2000) 23 Cal.4th 789, 794–795 [97 Cal.Rptr.2d 914, 3 P.3d 311].)

## I.

We turn first to the trial court's determination that appellant lacked "standing" to challenge Officer Smith's search and seizure. **(1)** In *Rakas v. Illinois* (1978) 439 U.S. 128, 138 [58 L.Ed.2d 387, 99 S.Ct. 421] (*Rakas*), the United States Supreme Court "reaffirmed the principle that the 'rights assured by the Fourth Amendment are personal rights, [which] . . . may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure,' [citation] . . . ." The court questioned "whether it serves any useful analytical purpose to consider this principle a matter of standing, distinct from the merits of a defendant's Fourth Amendment claim." (*Id.* at pp. 138–139.) Observing that the inquiry is the same under either approach, the court nevertheless concluded that "the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing. . . . [¶] . . . [¶] . . . [W]e think that definition of [Fourth Amendment] rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing." (*Id.* at pp. 139–140.) *Rakas* suggested that in place of "standing" courts may use such language as "whether the challenged search and seizure violated the Fourth Amendment rights of a criminal defendant who seeks to exclude the evidence obtained during it" (*id.* at p. 140), "whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect" (*ibid.*), or "whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place" (*id.* at p. 143). The California Supreme Court has noted that "since *Rakas* . . . , the United States Supreme Court has largely abandoned use of the word 'standing' in its Fourth Amendment analyses. (*See Minnesota v. Carter* (1998) 525 U.S. 83, 87 [142 L.Ed.2d 373, 119 S.Ct. 469] [(*Carter*)].) [¶] In the future, to avoid confusion with the federal high court's terminology, mention of 'standing' should be avoided when analyzing a Fourth Amendment claim." (*People v. Ayala* (2000) 23 Cal.4th 225, 254, fn. 3 [96 Cal.Rptr.2d 682, 1 P.3d 3].)

With this admonition in mind, we turn to the question whether the challenged search and seizure violated appellant's rights under the Fourth Amendment.

## II.

" '[A] person can have a legally sufficient interest in a place other than his own home so that the Fourth Amendment protects him from unreasonable governmental intrusion into that place.' [Citation.] [¶] '[C]apacity to claim the protection of the Fourth Amendment depends not upon a property right in the

invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place. [Citations.]' [Citation.] What the moving party must show is ' ". . . an actual (subjective) expectation of privacy," . . . [and the] subjective expectation of privacy is "one that society is prepared to recognize as 'reasonable,' " . . .' [Citations.] 'Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law *or to understandings that are recognized and permitted by society.* One of the main rights attaching to property is the right to exclude others, see W. Blackstone, Commentaries, Book 2, ch. 1, and one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude. Expectations of privacy protected by the Fourth Amendment, of course, need not be based on a common-law interest in real or personal property, or on the invasion of such an interest.' [Citation.]" (*People v. Moreno* (1992) 2 Cal.App.4th 577, 582–583 [3 Cal.Rptr.2d 66] (*Moreno*).)

■ In determining whether a defendant has a legitimate expectation of privacy in searched premises, "[t]he pertinent factors to consider include whether the defendant has a property or possessory interest in the thing seized or the place searched; whether he has the right to exclude others from that place; whether he has exhibited a subjective expectation that the place would remain free from governmental invasion; whether he took normal precautions to maintain his privacy; and whether he was legitimately on the premises. [Citations.]" (*People v. Thompson* (1996) 43 Cal.App.4th 1265, 1269–1270 [51 Cal.Rptr.2d 334] (*Thompson*).) "While generally one of these factors alone is insufficient to establish [a legitimate expectation of privacy] of a third party on the premises of another [citations], the greater the number of these factors and the greater their strength shown by the facts of a particular case, the more likely a protectable expectation of privacy will be found." (*People v. Koury* (1989) 214 Cal.App.3d 676, 686 [262 Cal.Rptr. 870].)

■ With respect to the first of these factors, we reiterate that a property or possessory interest in the place searched is not essential to establish a legitimate expectation of privacy. (*Moreno, supra*, 2 Cal.App.4th at p. 587.) One situation in which courts readily find a reasonable expectation of privacy with respect to premises not owned or possessed by another is that of an overnight guest. (*Minnesota v. Olson* (1990) 495 U.S. 91, 96–97 [109 L.Ed.2d 85, 110 S.Ct. 1684] (*Olson*).) "[T]he Supreme Court held 'Olson's status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable.' " (*Moreno*, at p. 583.) "[H]osts will more likely than not respect the privacy interests of their guests, who are entitled to a legitimate expectation of privacy despite the fact that they have no legal interest in the premises

and do not have the legal authority to determine who may or may not enter the household." (*Olson*, at p. 99.)

Status as an overnight guest, however, is not a prerequisite to assertion of Fourth Amendment rights regarding government action at a residence one does not own or possess. For example, in *Moreno*, the court held that a babysitter who was not an overnight guest had a legitimate expectation of privacy because he controlled the residence, as evidenced by his "likely" exclusive right to exclude others from the household while the child's parent was absent. (*Moreno, supra,* 2 Cal.App.4th at p. 584.) The court analogized to the situation of a "permissive user in temporary control of a vehicle," who has been held to have a legitimate expectation of privacy inside the vehicle. (*Id.* at p. 587, italics omitted.) ■ Since "[c]ourts consistently have given greater Fourth Amendment protection to a residence than to a vehicle," *Moreno* concluded that "all the more reason exists to give protection to a permissive occupant who temporarily controls a residence . . . ." (*Ibid.*, italics omitted.) According to *Moreno*, while satisfaction of the "right to exclude" factor is not required for a legitimate expectation of privacy (*id.* at p. 587, citing *Olson, supra,* 495 U.S. at pp. 98–100), a defendant who satisfies this requirement " 'will in all likelihood have a legitimate expectation of privacy.' " (*Moreno,* at p. 584, quoting *Rakas, supra,* 439 U.S. at pp. 143–144, fn. 12.) The right to exclude need not be premised on a property or possessory right, but may stem from a temporary, informal arrangement such as that between a babysitter and homeowner. (*Moreno*, at p. 584, fn. 3.)

In *People v. Cowan* (1994) 31 Cal.App.4th 795 [37 Cal.Rptr.2d 469] (*Cowan*), the court distinguished the situation of a babysitter or overnight guest from that of a casual, transient visitor. The defendant in *Cowan* fell into the latter category because he failed to show he controlled the premises. He did not demonstrate that he had "authority to be in the [residence] alone"; that he had " 'full use of the facilities' " of the residence alone; that he had "come and go[ne]" while the host was absent; that he had "permission to enter on his own"; that he had authority "to store anything there, to invite anyone (with or without the host's approval), or to visit without advance notice"; or that he had stayed "at the [residence] for an extended time." (*Id.* at pp. 800–801 & fn. 1.)

■ Another factor bearing on the existence of a reasonable expectation of privacy is whether the defendant " 'has exhibited an actual expectation of privacy; that is, . . . shown that he [sought] to preserve [something] as private.' " (*Kee v. City of Rowlett* (5th Cir. 2001) 247 F.3d 206, 212, quoting *Bond v. United States* (2000) 529 U.S. 334, 338 [146 L.Ed.2d 365, 120 S.Ct. 1462].) Taking normal precautions to maintain privacy "simply means that a defendant must outwardly behave as a typical occupant of the space in which

he claims an interest, avoiding anything that might publicly undermine his expectation of privacy." (*U.S. v. Vega* (5th Cir. 2000) 221 F.3d 789, 797 (*Vega*).) In *Vega*, the court found the defendant had taken normal precautions to maintain privacy where he had been storing or hiding drugs in his house and attempted to hide there when the police surrounded it, but made no attempt to prevent the police from entering the premises. (*Id.* at pp. 794, 796–797.) As the court stated, his conduct "did not evidence the lack of a subjective expectation of privacy" because he "did not nonchalantly acquiesce in the officers' presence in the home. Nor did he invite the officers or any other stranger in or anywhere near the house." (*Id.* at p. 796, fn. 10.) Similarly, the court in *Moreno* viewed the nonresident babysitter's "sitting on the living room couch" of the residence as indicative of a subjective expectation of privacy in the residence, even though the evidence was seized from bedrooms the babysitter had not entered on the night of the search. (*Moreno, supra,* 2 Cal.App.4th at pp. 580–581, 587.)

■ An individual who does not have a property or possessory interest in the invaded premises fulfills the factor of being "legitimately on [the] premises" by establishing that he or she was at the property and had permission from its resident to be there at the time of the search. (*Jones v. United States* (1960) 362 U.S. 257, 258, 267 [4 L.Ed.2d 697, 80 S.Ct. 725] (*Jones*), overruled on other grounds in *United States v. Salvucci* (1980) 448 U.S. 83, 84–85 [65 L.Ed.2d 619, 100 S.Ct. 2547].)[2] In *Jones*, the court held that the defendant was legitimately on the premises of the searched apartment because his testimony established that the holder of the apartment consented to his presence there, even though the holder had not consented to the use of the premises for any illegal activity. As stated in *Vega*, "the burglar's expectation of privacy loses its legitimacy not because of the wrongfulness of his *activity*, but because of the wrongfulness of his *presence* in the place where he purports to have an expectation of privacy." (*Vega, supra,* 221 F.3d at p. 797, italics added.) "Regardless of the activity conducted by [the defendant] at the residence," *Vega* explained, " 'one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of [his] right to exclude. . . .' " (*Id.* at p. 797, quoting *Rakas, supra,* 439 U.S. at pp. 143–144, fn. 12.)

■ Turning to the case before us, appellant clearly had permissive temporary control over the premises searched. (See *Moreno, supra,* 2 Cal.App.4th at p. 587.) Unangst, the head of household, had granted appellant

---

[2] *Salvucci* overruled *Jones*'s holding that defendants charged with crimes of possession had automatic "standing" to challenge the legality of a search. (*United States v. Salvucci, supra,* 448 U.S. at p. 85.) *Rakas, supra,* 439 U.S. at pages 141–142, rejected *Jones*, holding that being legitimately at the searched premises was sufficient in and of itself to permit a Fourth Amendment challenge.

the rights to be in the residence alone, to enter without permission, and to visit without advance notice. Unangst testified that, in general and particularly at the time of the search, appellant had his permission to come and go and use the facilities of the residence when the Unangsts were absent. Moreover, as the trial court allowed, at the time of the search appellant had a de facto exclusive right to exclude others from the premises. For purposes of the Fourth Amendment, such control is analogous to a property or possessory interest. (*Moreno, supra,* 2 Cal.App.4th at p. 587.)

Appellant demonstrated at least as great a subjective expectation of privacy in the searched premises as the defendant in *Moreno.* Instead of just sitting on the living room sofa when the police entered the residence, as did the defendant in *Moreno,* as soon as appellant was alerted to the presence of the police he left the living room and went to a downstairs bedroom and closed the door. The room in which he was found was also the place in which the search and seizure took place, whereas the defendant in *Moreno* did not enter any of the rooms in which the search and seizure in that case took place. (*Moreno, supra,* 2 Cal.App.4th at pp. 580–581.) In addition, like the defendant in *Vega* who hid in the searched premises but did not otherwise resist the police, appellant "did not nonchalantly acquiesce in the officers' presence in the home. Nor did he invite the officers or any other stranger in or anywhere near the house." (*Vega, supra,* 221 F.3d at p. 796, fn. 10.) Rather, he took " 'normal precautions to maintain privacy.' " (*Id.* at pp. 794, 796–797.) Also like the defendant in *Vega,* appellant had allegedly stored or hidden drugs in the house, and had attempted to hide there when the police appeared, but did not attempt to prevent the police from entering the premises. (*Ibid.*) Thus, this factor also weighs in favor of the conclusion that appellant had a legitimate expectation of privacy in the searched premises.

Additionally, appellant was "legitimately on [the] premises" because though, like the *Jones* defendant, he had apparently been using the premises to traffic in illegal narcotics to which the householder had not consented, he nevertheless possessed the householder's permission to be at the house. (*Jones, supra,* 362 U.S. at pp. 258, 267; *Vega, supra,* 221 F.3d at p. 797.) Indeed, appellant had a key to the residence for years, was not required to knock before entering, was authorized to use the house regularly for social purposes, to use its facilities for personal purposes, and to stay overnight and exclude others when the owner was absent.

With the exception of a technical property or possessory interest in the residence, all the pertinent considerations support the conclusion appellant had a legitimate expectation of privacy in the Unangst residence at the time of the search.

The legitimacy of appellant's expectation of privacy is also confirmed by analyzing the evidence in terms of the privacy continuum posited by *Carter, supra,* 525 U.S. 83.) In that case the persons seeking Fourth Amendment protection were present in the home searched, not as overnight guests as in *Olson, supra, 495 U.S. 91,* but for two and one-half hours for the sole purpose of conducting a drug transaction. (*Carter,* at p. 86.) "There [was] no suggestion [of a] previous relationship with" the resident, "[n]or was there anything similar to the overnight guest relationship in *Olson* to suggest a degree of acceptance into the household." (*Carter,* at p. 90, fn. omitted.) For those visitors, the apartment was "simply a place to do business." (*Ibid.*) As the court stated, "If we regard the overnight guest in . . . *Olson* as typifying those who may claim the protection of the Fourth Amendment in the home of another, and one merely 'legitimately on the premises' as typifying those who may not do so, the present case is obviously somewhere in between. But the purely commercial nature of the transaction engaged in here, the relatively short period of time on the premises, and the lack of any previous connection between [the visitors] and the householder, all lead us to conclude that [the visitors'] situation is closer to that of one simply permitted on the premises. We therefore hold that any search which may have occurred did not violate their Fourth Amendment rights." (*Carter,* at p. 91.)

Appellant's location on the privacy continuum suggested by *Carter* is clearly closer to that of the defendant in *Olson* than that of the defendants in *Carter.* (See *United States v. Cross* (W.D.Tenn. Oct. 12, 2001, No. 01-20020 G/BRE) 2001 U.S. Dist. LEXIS 23363, 2001 WL 1830146 at pp. *3, *6 (*Cross*) [finding facts "closer to the *Olson* . . . end of the privacy continuum than that inhabited by *Carter*" where defendant had no ownership or lease-hold interest in a rooming house and did not store personal belongings there but had familial ties with the owner of the building; was permitted to use the common facilities for bathing; occasionally stayed overnight with a friend who rented the searched room; had a key to that room and was allowed to be there when the renter was away; and did not have a key to the outer door that was "always" locked, but was admitted on request by the dwelling's other residents].)

While appellant had no property or possessory interest in the Unangst residence, and presented no evidence he stored anything at the residence besides methamphetamine or that he actually stayed overnight on the day of the search, he had an intimate previous social connection with the residents of the searched premises[3] going back at least four years. During that period,

---

[3] *U.S. v. Pollard* (6th Cir. 2000) 215 F.3d 643, 647, held that a defendant who was only "friends" with the lessee of the searched premises (and who had other connections to the premises) could assert a Fourth Amendment violation at the premises. This holding indicated that defendants lacking a property or possessory interest in the place searched need not have a

appellant possessed a copy of the house key; came to the house "on a daily basis" to visit, socialize and watch television; showered, did laundry and cooked at the house; and had unlimited access to the entire residence, even when the Unangsts were away. With the consent of the owner, appellant essentially used the house as an adjunct to his mobile home, which was located on the same property.

The People contend appellant lacked a legitimate expectation of privacy in the room in which the search and seizure took place because "there was no evidence [he] kept any personal property in the room or had actually stayed overnight on the day law enforcement seized the methamphetamine." The People rely upon *U.S. v. McNeal* (6th Cir. 1992) 955 F.2d 1067, and *U.S. v. Armenta* (9th Cir. 1995) 69 F.3d 304, but these cases do not support their argument. In *McNeal,* the court upheld denial of a motion to suppress not only because the defendant kept no clothes at the apartment that was searched and did not intend to sleep there on the night of the search, but also because of a lack of credible evidence he had any significant connection to the premises. (*McNeal,* at pp. 1070–1074.) Although the defendant had keys to the apartment, he also had keys to other apartments in the complex in which he did not live and testified he was in the apartment only to use the phone. The trial court had also rejected the credibility of the lessee of the apartment, who claimed to be the defendant's lover. (*Ibid.*) In *Armenta,* the defendant claimed the right to challenge the search "because he was an overnight guest at the house." (*Armenta,* at p. 308.) The house was "barely furnished and exhibited few signs of habitation," such as dishes or towels, and while Armenta's wallet, baptismal certificate and Social Security card were found in the house, there was no clothing or other indicia of residency. Finding insufficient evidence the defendant was an overnight guest, the court affirmed denial of his motion to suppress. (*Id.* at pp. 306, 308–309.)

As discussed above, the facts that appellant was not at the time of the search an overnight guest and that he kept no personal property at the searched premises do not in and of themselves defeat his Fourth Amendment claim. For example, *U.S. v. Fields* (2d Cir. 1997) 113 F.3d 313, 317–321, held that, because of their "significant connection" to the residence, the two defendants had legitimate expectations of privacy at a residence at which they did not live, although there was no indication either was an overnight guest or kept clothing or personal items on the premises. One of the defendants had a key to and paid rent for use of the residence, had visited 40 to 50 times, and had permission to bring guests and come and go as he pleased, even when the lessee of the residence was not at home; the other defendant was his guest.

---

familial tie with the premises' owner or lessee to claim a protectable interest in that place, and suggested that a strong, social non-familial tie may shift the defendant closer to the *Olson* side of *Carter*'s "privacy spectrum." (*Ibid.*)

(*Id.* at pp. 320–321.)[4] For similar reasons, appellant clearly had a significant and current interest in Unangst's residence.

Similarly unavailing is the People's argument that " '[t]here was no evidence that [appellant] ever stayed at the [Unangst residence] for an extended time,' " or that the Unangst residence was a " 'substitute home' " (*Cowan, supra,* 31 Cal.App.4th at pp. 799, 800). The "substitute home" language derives from cases analyzing an overnight guest's expectation of privacy. (*Id.* at p. 799.) Appellant does not, however, claim the status of an overnight guest. His contention is that he has shown a legitimate expectation of privacy despite the fact he was not an overnight guest.

The People also rely upon *Jones, supra,* 362 U.S. at page 267, for the proposition that because "the uncontested evidence showed that appellant did not have Unangst's permission to sell methamphetamine from the residence. . . . he could not assert a Fourth Amendment violation." We have already rejected this argument. *Jones* does not hold or even imply that consent to conduct illegal activities is necessary to assert a Fourth Amendment violation, and more recent case law indicates that lack of such permission is not inconsistent with a legitimate expectation of privacy. (See *Jones,* at pp. 258–259, 267, fn. 2; *Vega, supra,* 221 F.3d at p. 797.) The critical consideration is that appellant had the owner's permission to be where he was.

Appellant presented sufficient evidence of a legitimate expectation of privacy at the Unangst residence at the time of the challenged search and seizure.[5] Because denial of his motion to suppress was based on the trial court's erroneous determination that appellant lacked a legitimate expectation of privacy, and since we cannot determine the extent to which this ruling caused appellant to plead no contest, the judgment must be reversed. (*People v. Koury, supra,* 214 Cal.App.3d at p. 691.)

---

[4] See also *Moreno, supra,* 2 Cal.App.4th at pages 580, 581, 588 [defendant not overnight guest]; *U.S. v. Gamez-Orduno* (9th Cir. 2000) 235 F.3d 453, 459, footnote 8 ["[w]hile overnight guest status is .sufficient for Fourth Amendment protection, it may not be necessary"]; *U.S. v. Heath* (6th Cir. 2001) 259 F.3d 522, 532–534 [defendant had legitimate expectation of privacy though he kept no clothes at the premises and was not an actual overnight guest]; *Cross, supra,* 2001 U.S.Dist. LEXIS 23363, *20 [whether defendant was overnight guest is "not dispositive"]; 5 LaFave, Search and Seizure (3d ed. 2000 supp.) section 11.3, page 15.

[5] Given this conclusion, we need not address appellant's additional argument that he had a reasonable expectation of privacy due to his asserted role as "house sitter" at the time of the search.

## DISPOSITION

The judgment is reversed. The case is remanded to the superior court to vacate appellant's plea of no contest if he makes an appropriate motion within 30 days after this opinion becomes final. If appellant files such motion, the superior court shall vacate the plea, reinstate the original charges contained in the information if the People so move, conduct a hearing on the constitutionality of the search at issue, and proceed accordingly. If appellant does not move to vacate, the superior court shall reinstate the judgment.[6]

Haerle, J., and Ruvolo, J., concurred.

---

[6] The People claim appellant is not entitled to withdraw his plea and urge this court to "remand for a hearing on the merits of the suppression motion" only. None of the authorities they cite involve a guilty or no contest plea entered after a preliminary finding that the defendant lacked a reasonable expectation of privacy. In *Moreno, supra,* 2 Cal.App.4th at page 588, after denial of the suppression motion, a jury convicted the defendant; the judgment was reversed on appeal. In *U.S. v. Armenta, supra,* 69 F.3d at page 309, the guilty plea was conditioned on the right to appeal denial of the suppression motion; the case was remanded for further findings. In *People v. Saldana* (2002) 101 Cal.App.4th 170, 176 [123 Cal.Rptr.2d 763], the court's error was in finding a detention proper.