Filed 4/30/13  P. v. McQueen CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D062025 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD235744) |
| CURTIS ALLEN McQUEEN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Leo Valentine, Jr., and Fredrick Maguire, Judges.  Affirmed.

A jury found Curtis Allen McQueen guilty of unlawfully possessing a controlled substance (Health & Saf. Code, § 11350, subd. (a)).  McQueen admitted two prison priors (Pen. Code, §§ 667.5, subd. (b), 668);[1] a probation denial prior (§ 1203, subd. (e)(4)); and a prior strike (§§ 667, subds. (b)-(i), 1170.12, 668).  The trial court struck the two

---

1       Unless otherwise indicated, all further statutory references are to the Penal Code.

prison priors but denied the request to strike the prior strike, and it sentenced McQueen to four years in prison.

McQueen contends that the trial court (1) erred in denying his motion to suppress evidence and (2) abused its discretion in denying his request to strike his prior strike. We conclude that McQueen's arguments are without merit, and we affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

At approximately 1:00 a.m. on July 28, 2011, police responded to a report of a fight between several people inside of a home at which Michael Smith and his teenage son resided. An airborne police unit in a helicopter was the first to arrive and recorded the scene from the air on an infrared camera. A short time later, police officers arrived by car, parking in the alley in back of the house. Smith and McQueen, who had exited the house and were in the backyard, were detained by police officers while they investigated the situation. Officers Kyle Markwald and Daniel Weisenfluh then arrived at the house, entering the backyard from the alley. As the police officers passed through the backyard toward the house, Officer Markwald noticed a cloth case for sunglasses on the ground, slightly underneath the edge of a truck parked in the backyard. Officer Markwald picked up the case and could see several pieces of rock cocaine inside of it, which were later determined to have a weight of 11.25 grams. A police officer at the residence contacted the airborne helicopter unit to determine whether the infrared footage showed someone placing the sunglasses case under the truck. The airborne helicopter

2

unit reported that the footage showed a person meeting McQueen's description throwing an object in the direction of the truck as the police officers arrived on the scene.

Police arrested McQueen, and he was charged with possession of narcotics for sale. After arresting McQueen, police searched him and found $341 in his pockets.

McQueen made a motion to suppress the contents of the sunglasses case and the money found in his pockets. After holding a hearing on the motion to suppress at which four witnesses testified, the trial court denied the motion, ruling that McQueen did not have a reasonable expectation of privacy in the yard of Smith's house, and that the discovery of the money in McQueen's pockets was the product of a legitimate search incident to a valid arrest.

At a jury trial at which McQueen testified, the jury convicted him of the lesser included offense of simple possession of narcotics. (Health & Saf. Code, § 11350, subd. (a).) After McQueen admitted two prison priors (§§ 667.5, subd. (b), 668); a probation denial prior (§ 1203, subd. (e)(4)); and a prior strike (§§ 667, subds. (b)-(i), 1170.12, 668), the trial court struck the two prison priors but declined to strike the prior strike. The trial court sentenced McQueen to four years in prison.

II

DISCUSSION

A.    *The Trial Court Properly Denied the Motion to Suppress*

McQueen contends that the trial court erred in denying the motion to suppress the evidence of the contents of the sunglasses case and the money in his pockets, arguing that (1) the evidence of the narcotics contained in the sunglasses case was obtained pursuant

3

to an illegal search, and (2) the discovery of the money in McQueen's pockets in a search incident to arrest for narcotics possession was the fruit of the same illegal search.

1.    *Standard of Review*

"'"An appellate court's review of a trial court's ruling on a motion to suppress is governed by well-settled principles. [Citations.] [¶] In ruling on such a motion, the trial court (1) finds the historical facts, (2) selects the applicable rule of law, and (3) applies the latter to the former to determine whether the rule of law as applied to the established facts is or is not violated. [Citations.] 'The [trial] court's resolution of each of these inquiries is, of course, subject to appellate review.' [Citations.] [¶] The court's resolution of the first inquiry, which involves questions of fact, is reviewed under the deferential substantial-evidence standard. [Citations.] Its decision on the second, which is a pure question of law, is scrutinized under the standard of independent review. [Citations.] Finally, its ruling on the third, which is a mixed fact-law question that is however predominantly one of law, . . . is also subject to independent review."'" (*People v. Ayala* (2000) 23 Cal.4th 225, 254-255 (*Ayala*).) Whether a defendant has a reasonable expectation of privacy is a mixed question of law and fact which we review independently. (*People v. Brendlin* (2006) 38 Cal.4th 1107, 1113.) Regardless of the subsequent evidence presented at trial, "[w]hen reviewing the trial court's denial of a motion to suppress, we consider only the evidence presented to the trial court in connection with that motion." (*People v. Tolliver* (2008) 160 Cal.App.4th 1231, 1237.)

2.       *McQueen Did Not Have Reasonable Expectation of Privacy in Smith's Backyard*

The trial court denied the motion to suppress on the ground, among others, that McQueen — as an occasional guest in Smith's home — did not have a reasonable expectation of privacy in the contents of Smith's backyard. As we will explain, we agree.

"'[I]n order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable, *i.e.*, one that has "a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society."' [Citation.] 'In other words, the defendant must show that he or she had a subjective expectation of privacy that was objectively reasonable.'" (*Ayala*, *supra*, 23 Cal.4th at p. 255.) "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed. [Citation.] And since the exclusionary rule is an attempt to effectuate the guarantees of the Fourth Amendment [citation], it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the rule's protections." (*Rakas v. Illinois* (1978) 439 U.S. 128, 133-134.) "Defendant bears the burden of showing a legitimate expectation of privacy. [Citations.] Among the factors to be considered are '"'whether the defendant has a [property or] possessory interest in the thing seized or the place searched; whether he has the right to

5

exclude others from that place; whether he has exhibited a subjective expectation that it would remain free from governmental invasion, whether he took normal precautions to maintain his privacy and whether he was legitimately on the premises.'"'" (*People v. Roybal* (1998) 19 Cal.4th 481, 507.)

The United States Supreme Court has explained that even though the "text of the [Fourth] Amendment suggests that its protections extend only to people in 'their' houses[,] . . . in some circumstances a person may have a legitimate expectation of privacy in the house of someone else." (*Minnesota v. Carter* (1998) 525 U.S. 83, 88.) For example, the Court in *Minnesota v. Olson* (1990) 495 U.S. 91 decided that "an overnight guest in a house had the sort of expectation of privacy that the Fourth Amendment protects." (*Carter*, at p. 89, citing *Olson*.) The Supreme Court explained, however, that on the opposite side of the spectrum — without an expectation of privacy — is a person who is "merely 'legitimately on the premises.'" (*Carter*, at p. 91.) Thus, "an overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not." (*Id*. at p. 90.) "'"'[O]ccasional presence on the premises as a mere guest or invitee'"' is insufficient to confer" a reasonable expectation of privacy. (*Ayala*, *supra*, 23 Cal.4th at p. 255.)

Case law establishes that only in "'extraordinary situations'" will someone who is not an overnight guest have a legitimate expectation of privacy in a residence. (*People v. Cowan* (1994) 31 Cal.App.4th 795, 799, italics added.) To determine whether an extraordinary situation is present, courts will examine whether the defendant had authority to "be in the [residence] alone, to enter without permission, to store anything

6

there, to invite anyone (with or without the host's approval), or to visit without advance notice," and whether the defendant "had ever stayed at the [residence] for an extended time." (*Id.* at p. 800, fn. omitted.)

*People v. Stewart* (2003) 113 Cal.App.4th 242, 255, applied this approach, deciding that the defendant had a reasonable expectation of privacy because he had previously stayed overnight at the residence; "possessed a copy of the house key; came to the house 'on a daily basis' to visit, socialize and watch television; showered, did laundry and cooked at the house; . . . had unlimited access to the entire residence, even when the [home's residents] were away"; and "[w]ith the consent of the owner, . . . essentially used the house as an adjunct to his mobile home, which was located on the same property."

This case does not present an extraordinary situation that would give McQueen a reasonable expectation of privacy in Smith's residence and backyard.[2] According to the evidence at the suppression hearing, Smith had known McQueen for "several years," and McQueen had a close relationship with Smith's 17-year-old son, to whom he acted as a mentor, and McQueen had given Smith's son a ride to or from school several times. According to Smith, McQueen "would come by and do things[;] we would talk here and there . . . . I don't know if I would say every week, but, you know." McQueen never stayed overnight at Smith's house, did not keep clothes or other belongings at Smith's

---

2     For the purposes of our analysis, we treat the fenced-in backyard as part of the home for Fourth Amendment purposes. "[A] home's '"curtilage," the land immediately surrounding and associated with the home,' 'has been considered part of the home itself for Fourth Amendment purposes.'" (*People v. Robinson* (2012) 208 Cal.App.4th 232, 253, fn. 23, quoting *Oliver v. United States* (1984) 466 U.S. 170, 180.)

house, was never in the home by himself, and did not have keys to the house or the backyard gate. On the night of McQueen's arrest, Smith was not at home when a violent domestic dispute erupted between some of Smith's house guests. Smith's son called McQueen for help in removing the house guests from the residence. McQueen arrived at the house around the same time that Smith arrived home, and they were in the process of removing the house guests when the police showed up.

As McQueen was merely a friend of the family and an occasional visitor to the home for social purposes, entered only with the permission of the family members and did not keep any of his belongings in the home, this case does not present an extraordinary situation. Under the circumstances, McQueen could not have had a reasonable expectation of privacy in the content of Smith's home or backyard, and his motion to suppress the evidence in the sunglasses case was properly denied on that basis.

The sole basis for McQueen's argument that the evidence of the cash found in his pockets during the search incident to his arrest should have been suppressed is that his arrest was the result of the purportedly illegal search of the sunglasses case that contained narcotics. McQueen relies on "'fruit of the poisonous tree' doctrine," under which "both direct and indirect products of an unreasonable search are subject to exclusion." (*People v. Werner* (2012) 207 Cal.App.4th 1195, 1213.) As we have rejected McQueen's challenge to the search of the backyard and the sunglasses case, we also reject his argument that the evidence obtained during the search incident to his arrest should have been suppressed.

B.      *The Trial Court Did Not Abuse Its Discretion in Declining to Strike a Prior Strike*

At sentencing, McQueen requested that the trial court strike his 1997 strike conviction for arson of an inhabited structure in 1994.  The trial court denied the request, concluding that it did not find a sufficient basis to strike that strike.

A trial court may strike a finding under the "Three Strikes" law that a defendant has previously been convicted of a serious and/or violent felony (i.e., a strike) on its "own motion or upon the application of the prosecuting attorney . . . in furtherance of justice." (§ 1385, subd. (a); *People v. Williams* (1998) 17 Cal.4th 148, 158 (*Williams*), citing *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.)  In determining whether to strike a strike, the court "must consider whether, in light of the nature and circumstances of [the defendant's] present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*Williams*, at p. 161.)

The trial court's "failure to dismiss or strike a prior conviction allegation is subject to review under the deferential abuse of discretion standard." (*People v. Carmony* (2004) 33 Cal.4th 367, 374.)  "In reviewing for abuse of discretion, we are guided by two fundamental precepts.  First, '"[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary."'"  (*Id.* at p. 376.)  Second, "'"[a]n appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge,'"'" and thus the trial court's "'"decision will

9

not be reversed merely because reasonable people might disagree."'" (*Id.* at p. 377.) Taken together, these two precepts establish the overarching principle on review that "a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Ibid.*)

Pointing to comments the trial court made during sentencing, McQueen contends that the trial court abused its discretion in denying his request to strike the strike because it misunderstood the applicable legal principles.

As McQueen points out, a large portion of the sentencing hearing was devoted to a discussion of whether McQueen was eligible to be placed on probation in a drug treatment program under section 1210.1 based on his conviction for a nonviolent drug possession offense. As the trial court explained, McQueen was not eligible for that program because he fell within the statutory exclusion for a defendant who had been incarcerated within the five-year period before the present offense. (§ 1210.1, subd. (b)(1).) The trial court made several comments relating to its lack of discretion to sentence McQueen to probation and to give McQueen a "chance," as requested by McQueen. The trial court commented the jury had already given McQueen a "chance" by finding him guilty of the lesser included offense of simple possession, when the facts could have supported a conviction for possession of narcotics for sale.

When addressing whether it would strike the strike, the trial court stated, "So when I look at can I strike a strike, Mr. McQueen, I would be striking a strike because I hate to see you go back to prison at this stage of your life. But that's not [a] legal reason[] to strike a strike. It would be intellectual dishonesty for me to do that. You weren't out of

10

prison five years." The trial court explained that the one legally cognizable factor for striking a strike that applied to McQueen's case was that the present offense was less serious than the prior strike for arson. The trial court concluded, however, that in its view, the one factor was "not sufficient."

McQueen contends that because the trial court mentioned the fact that McQueen wasn't "out of prison five years," in deciding whether to strike the strike, it was confusing the legal requirements granting probation under section 1210.1 for a nonviolent drug possession offense with the factors applicable to a decision to strike a strike. We disagree. Put in its entire context, as we understand the trial court's comment, the trial court mentioned the short time that McQueen had stayed out of prison before reoffending to illustrate that McQueen fell within the spirit of the Three Strikes law because he had reoffended in a short time. The trial court was pointing out that, accordingly, McQueen did not present an extraordinary case for striking a strike despite his progress toward becoming a responsible citizen in the time that he was out of prison. Indeed, contrary to McQueen's suggestion that the trial court failed to consider his efforts at rehabilitation, the trial court's comments showed that it *did* consider that factor but found it to lack weight in this circumstance because of the short time before reoffending. In sum, the trial court *did* conduct the proper inquiry of considering "the nature and circumstances of [the defendant's] present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects." (*Williams*, *supra*, 17 Cal.4th at p. 161.)

11

McQueen also argues that based on some of the trial court's comments, the court improperly decided against striking the strike because it believed that McQueen should have been convicted of possession of narcotics for sale rather than simple possession. We reject this argument because the record does not support it. Although, as we have described, the trial court stated that the jury had likely chosen to give McQueen a break by convicting him of the lesser included offense, that comment was made in a wholly unrelated context. At no time did the trial court indicate that its decision to deny the request to strike the strike was influenced by the jury's verdict on the lesser included offense. Further, the trial court dispelled any such suggestion by stressing, as a general matter near the beginning of the hearing, "I think it would be error for this court to conclude that it could substitute its judgment whether or not this was possession for sale after the jury has made such a finding. I just wanted the record to reflect that I am not prepared to do that, because I do not think this court has the authority to do that or the right to do that. That would be contrary to jurisprudence, in fact. It was not tried to the court. It was tried to the jury."

In sum, we conclude that the trial court did not abuse its discretion in declining to strike McQueen's prior strike. The trial court applied the proper legal criteria, and it understood and exercised its discretion to reasonably conclude that McQueen did not fall outside of the spirit of the Three Strikes law.

DISPOSITION

The judgment is affirmed.


IRION, J.

WE CONCUR:


BENKE, Acting P. J.


HALLER, J.