Filed 8/27/14  P. v. Rodarte CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B247662 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA121786) |
| v. | |
| GUSTAVO RODARTE, JR., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Lori Ann Fournier and John A. Torribio, Judges.  Reversed with directions.

Mae G. Alberto for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Linda C. Johnson, Supervising Deputy Attorney General, and Robert M. Snider, Deputy Attorney General, for Plaintiff and Respondent.

_____

Defendant Gustavo Rodarte appeals from the judgment entered following a jury trial in which he was convicted of two counts of assault with a firearm, shooting at an occupied vehicle, and possession of a firearm by a convicted felon, with gang enhancement and personal firearm-use allegations.

Defendant contends the trial court erred by denying his suppression motion on the theory he had not met his burden of specifying violations of the Fourth Amendment. We agree. Defendant identified 11 police contacts in issue, including the dates, locations, and officers involved, and asserted each one was warrantless and nonconsensual. This was all that was required. The trial court erred by insisting defendant had to allege additional facts showing each contact was unjustified. We therefore conditionally reverse the judgment and remand for a new suppression hearing.

Defendant also raises a number of other issues that we conclude have no merit.

## BACKGROUND

### 1. The charged offenses

About 5:00 a.m. on September 25, 2011, Caitlyn Nguyen drove to the area of Nordesta and Spry in Norwalk to pick up her sister. Viet Huynh accompanied Nguyen. They had never been in the area before. Nguyen parked "in the middle of the street" with her car's headlights on and waited about 30 minutes for her sister to come out. At some point, Huynh moved into the driver's seat. Around 5:30 a.m., someone shone a red laser through the windshield of Nguyen's car. Huynh began to drive away, but as he did, he heard a man say, "'Hey.'" They also saw a flashlight pointed at them. Huynh made a U-turn and stopped in front of the house from which the voice came. He lowered the car window.

Nguyen and Huynh saw two men in the yard of the home, behind a fence. A third man came out of the yard and ran or quickly walked, limping, toward their car, stopping about five feet away. The man lifted a shotgun and fired at them two or three times as Huynh drove away. The shotgun pellets punctured the trunk and taillights of Nguyen's car and shattered a side mirror. Huynh stopped at a gas station and phoned 911.

2

Sheriff's deputies arrived and drove Nguyen and Huynh back to the neighborhood, where they pointed out the house. The deputies established a containment area and ordered everyone out of the house. Adrian Acosta, Sr., his son Adrian Acosta, Jr., defendant, another young man, Lisbet Gonzalez, Lucero Ibarra, and a child emerged. The deputies placed Huynh and Nguyen in different squad cars and conducted a field showup of Acosta, Jr., defendant, and the third young man. Huynh and Nguyen identified defendant as the man who shot at them.

Huynh identified defendant at trial, but Nguyen was unable to do so. However, she testified the man in defendant's booking photo looked like the man who had shot at her car. She also had identified defendant at the preliminary hearing.

Sheriff's deputies searched the Acosta house and neighboring yards but did not find a shotgun. They swabbed defendant's hands for gunshot residue (GSR) and booked the kit in evidence. They also collected four expended shotgun shells, two from the sidewalk and two from the street. A form directing retention of the GSR kit was transmitted to a secretary who failed to deliver the form to the property custodian. The kit therefore was destroyed after six months without being analyzed. A criminalist testified a shotgun typically deposits less GSR on the shooter than a pistol, and washing hands is an effective way to remove GSR.

## 2.    The gang connection

The site of the shooting was within territory claimed by the Neighborhood gang. Prosecution gang expert Ivania Farias testified the garage of the Acosta house was a known "crash pad" where Neighborhood gang members congregated, used drugs, hid weapons, sold narcotics, and planned crimes. They also "vandalize[d]" the garage. Neighborhood gang member Adrian Acosta, Jr., lived in the house.

Farias testified she had reviewed 11 field identification (FI) cards reflecting occasions from 2008 to 2011 when defendant admitted his membership in the Neighborhood gang to sheriff's deputies. She also had spoken with some of those deputies and reviewed photographs showing defendant "throwing gang signs" and

3

depicting his gang tattoos. Farias opined defendant had been an active member of the Neighborhood gang since 2007.

Deputies involved in three of the contacts with defendant in which FI cards were written testified at trial. Detective Gina Kolowski testified she encountered defendant on August 27, 2008, at Vista Verde Park in the company of five other young men, three of whom she knew to be members of the Neighborhood gang. Kolowski testified defendant admitted he, too, was a member of the gang. Near the group was a freshly painted "NBD" graffito. Sergeant Francis Espleta testified he encountered defendant at Vista Verde Park twice on May 29, 2009. Defendant was with his girlfriend Lucero Ibarra and Anthony Contreras. Contreras and defendant both admitted their membership in the Neighborhood gang to Espleta. Defendant told Espleta his moniker was "Pistol" or "Creeper." Deputy Paul Marella also testified about the second contact with defendant, Ibarra, and Contreras on May 29, 2009.

Farias, Kolowski, Espleta, Marella, and booking officer Thomas Morean testified regarding defendant's tattoos, and the prosecution introduced six photographs of defendant's tattoos—two taken by Kolowski on August 27, 2008, and the other four taken by Marella after defendant was arrested in this case. His tattoos included a "187" on his right index or "trigger" finger; "NBD," "562," and "L.A." elsewhere on his hands; "Neighborhood," "Pistol Creeper" on the back of his neck; "NBD" on his chest and shoulder; "S" and "E" on his shoulders; and "Crook" or "Crooks" on his chest. At booking, defendant told Morean he was a member of the Neighborhood gang.

The prosecution also introduced two photographs of defendant in the company of Contreras and other members of the Neighborhood gang. In one of the photographs, defendant, Contreras, and others were making gang hand signs pertaining to the Neighborhood gang.

Farias testified the primary activities of the Neighborhood gang include assault with a deadly weapon, weapon possession, vehicle theft, graffiti, and drug sales. She testified gang members will assault anyone—an "innocent person" or a rival gang

4

member—if they believe the person is a threat to control of their territory. Gang members gain status within the gang by committing violent acts.

Farias, who was also the investigating officer in this case, opined the charged crimes were committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members. She explained gang members possess guns to protect themselves, their fellow gang members, and their neighborhoods. Assaulting "innocent civilians" makes it easier for members of the gang to commit future crimes by intimidating the community, causing witnesses to refrain from reporting gang members' crimes, thereby allowing the gang's members to "get away with it and continue with the same type of activity." Farias further opined the charged crimes were committed in association with gang members because Adrian Acosta, Jr., and another gang member lived at the Acosta house and gang members congregated in the garage at that house. Commission of the crimes would earn defendant respect and elevate his status within the gang.

Farias further testified about the existence and nature of two predicate offenses committed by other Neighborhood gang members, one of which involved the murder of "an innocent victim" in the territory of a rival gang and the other an "execution-style attempted murder" of someone who went to a residence about three blocks from the Acosta house to buy a gun.

### 3. Defense evidence

Ibarra testified she, defendant, and their baby slept at the Acosta house for the first time on the night of September 24, 2011. Adrian Acosta, Jr., and Lisbet Gonzalez were also present. Ibarra and defendant went to bed about 11:00 p.m. She heard two or three gunshots from the vicinity of the riverbed behind the house around 4:00 or 5:00 the next morning. Defendant and the baby were still asleep, so she went back to sleep.

5

Dr. Mitchell Eisen testified as an expert on factors affecting memory and the accuracy of eyewitness identification. He testified showups are inherently suggestive, especially if only one person in the showup fits a witness's description of the culprit.

## 4. Verdicts and sentencing

In bifurcated proceedings, the jury convicted defendant of shooting at an occupied vehicle and two counts of assault with a firearm. The jury found defendant had personally used a firearm in the commission of the assaults and that all three offenses were committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members. Defendant waived a jury trial on the remaining charge, and the trial court found him guilty of possession of a firearm by a felon.

The trial court sentenced defendant to an aggregate term of 27 years to life: 15 years to life for shooting at an occupied vehicle with the gang enhancement finding, pursuant to Penal Code section 186.22, subdivision (b)(4)(B),[1] plus a consecutive term of 12 years for one of the assault convictions, with terms on the remaining convictions stayed pursuant to section 654.

## DISCUSSION

## 1. The trial court erred by denying defendant's suppression motion.

Defendant contends the trial court erred by denying his suppression motion on the theory he had not met his burden of specifying violations of the Fourth Amendment. We agree. Defendant identified the 11 police contacts in issue, including the dates, locations, and officers involved, and asserted each one was warrantless and nonconsensual. This was all that was necessary to require the prosecution to justify each contact. The trial court erred by insisting defendant had to allege additional facts showing each contact was unjustified.

---

[1] Undesignated statutory reference pertain to the Penal Code.

### a. Proceedings in the trial court

Defendant sought to suppress all evidence regarding and stemming from the 11 police contacts in which officers wrote FI cards, together with observations and evidence obtained during these contacts, including photographs, admissions of gang membership, descriptions of his tattoos and clothing, and the identity of, and statements by, his companions on the ground these contacts were warrantless seizures in violation of the Fourth Amendment. Defense counsel subsequently "orally amend[ed]" the motion to allege the stops were nonconsensual and filed supplemental points and authorities to which he attached copies of the FI cards generated in the 11 contested police encounters. Three of the FI cards referred to defendant being "detained" and one indicated the encounter stemmed from a "T-stop" (traffic stop), adding support to his allegation these contacts were not consensual.

Judge Fournier conducted two hearings on the motion, denying it each time on the ground defendant had not met his burden of specificity. At the second hearing, she explained, "I believe that if you're contesting, F.I. number 2, then you have to be able to specify, in context with F.I. number 2. Let's say on August 4th, 2008, there is an F.I. that talks about a stop at 1:33 in the morning. Mr. Rodarte has to be able to assert that in that particular instance, my car was searched, my home was searched, I was not given *Miranda*[2] rights. I was not—I was handcuffed and placed outside or in the back of the car. You're not saying any of that. All you're saying is there is no consent. That's not, based on *Williams*,[3] what the People are required to be able to contest or to be able to bring in evidence. So you have the burden of saying why these different inciden[ts] are in violation of the 4th Amendment and in what way they are in violation of the 4th Amendment, not just a broad generalization that there is no arrest or search warrant and I

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602].

didn't consent. That doesn't give them an idea of what the particular basis is for each of these different F.I. cards."

The FI cards were not themselves admitted at trial, but evidence about them and the underlying contacts was admitted. Kolowski testified regarding her August 27, 2008 contact with defendant in Vista Verde Park, the FI card she wrote, and photographs of defendant's tattoos she took during this contact, which were admitted as prosecution exhibits at trial. Notably, Kolowski's FI card is one of three reflecting her opinion defendant was "detained" during this contact, and defendant objected at trial to her testimony regarding the fresh graffiti she observed during the contact, as addressed later in this opinion.

Espleta and Marella testified at trial regarding their May 29, 2009 contacts with defendant in Vista Verde Park and the two FI cards written regarding those contacts. Farias testified "defendant [had] been F.I.'d" "[a]pproximately, eleven times" from 2008 to 2011, and her expert testimony about defendant was based, in part, upon her review the FI cards and photographs of defendant. In addition, the prosecutor twice referred to the 11 FI cards and the underlying contacts during her closing argument.

### b.    Consensual contacts, detentions, and arrests

For Fourth Amendment purposes, there are three basic categories of police interaction with individuals: consensual encounters that do not restrain an individual's liberty and require no objective justification by police; detentions of strictly limited duration, scope, and purpose, which may be undertaken by an officer who has an articulable suspicion that a person has committed or is about to commit a crime; and arrests, that is, "seizures of an individual which exceed the permissible limits of a detention, seizures which include formal arrests and restraints on an individual's liberty which are comparable to an arrest, and which are constitutionally permissible only if the

---

**3** *People v. Williams* (1999) 20 Cal.4th 119 (*Williams*).

8

police have probable cause to arrest the individual for a crime." (*Wilson v. Superior Court* (1983) 34 Cal.3d 777, 784.)

      **c.      Suppression motion procedure and standard of review**

"[W]hen defendants move to suppress evidence, they must set forth the factual and legal bases for the motion, but they satisfy that obligation, at least in the first instance, by making a prima facie showing that the police acted without a warrant. The prosecution then has the burden of proving some justification for the warrantless search or seizure, after which, defendants can respond by pointing out any inadequacies in that justification." (*Williams*, *supra*, 20 Cal.4th at p. 136.) "[I]n the case of a warrantless search or seizure, defendants are not *required* to anticipate the prosecution's justifications. Law enforcement personnel, not defendants, are in the best position to know what justification, if any, they had for proceeding without a warrant. Therefore, defendants who do not know, and hesitate to guess, what justification the prosecution might offer can simply await the prosecution's argument and evidence, and then respond with specific objections." (*Ibid.*) "[T]he burden of raising an issue is distinct from the burden of proof. The prosecution retains the burden of proving that the warrantless search or seizure was reasonable under the circumstances. [Citations.] But, if defendants detect a critical gap in the prosecution's proof or a flaw in its legal analysis, they must object on that basis to admission of the evidence or risk forfeiting the issue on appeal." (*Id.* at p. 130.)

"The determinative inquiry in all cases is whether the party opposing the motion had fair notice of the moving party's argument and fair opportunity to present responsive evidence." (*Williams*, *supra*, 20 Cal.4th at p. 135.) "A defendant's motion that argues a search or seizure was unreasonable because there was no warrant gives the prosecution fair notice of the defendant's argument." (*People v. Smith* (2002) 95 Cal.App.4th 283, 296 (*Smith*).)

In ruling upon a motion to suppress, the trial court judges the credibility of the witnesses, resolves any conflicts in the testimony, weighs the evidence, and draws factual

inferences. We will uphold the trial court's findings, express or implied, on such matters if they are supported by substantial evidence, but we independently review whether the search or seizure was reasonable under the Fourth Amendment. (*People v. Redd* (2010) 48 Cal.4th 691, 719; *People v. Leyba* (1981) 29 Cal.3d 591, 596–597.)

**d.    The trial court erroneously concluded defendant had made an insufficient showing of a Fourth Amendment violation**

Defendant asserted the police contacts giving rise to the FI cards attached to his supplemental points and authorities were warrantless and nonconsensual seizures. The FI cards specified the dates, locations, and officers involved in these contacts. This was sufficient to meet his burden of raising the Fourth Amendment issues and to provide the prosecution with adequate notice. In addition, the attached FI cards reflected that at least four of the contacts were nonconsensual detentions. While it may have been burdensome for the prosecution to have each officer involved in these contacts testify at an evidentiary hearing to attempt to justify each contact, the difficult nature of the prosecution's task did not warrant placing a heavier initial burden upon defendant in direct contravention of *Williams*, as the trial court did in this case.

The improper admission of evidence that should have been excluded as obtained in violation of the Fourth Amendment is subject to harmless error analysis under the standard of *Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824] (*People v. Moore* (2011) 51 Cal.4th 1104, 1128–1129; *People v. Memro* (1995) 11 Cal.4th 786, 847), that is, the Attorney General has the burden of proving beyond a reasonable doubt that the error did not contribute to the verdict. Here, the Attorney General has not even argued that the erroneous denial of defendant's suppression motion was harmless, much less carried the burden of proving harmlessness. Under the circumstances, the appropriate remedy is a conditional reversal. (*Smith*, *supra*, 95 Cal.App.4th at pp. 305–306; *People v. Moreno* (1992) 2 Cal.App.4th 577, 588.)

Because the trial court may ultimately reinstate the judgment, we address defendant's numerous other contentions.

10

**2.      Sufficient evidence supports the gang enhancement finding.**

Defendant contends the evidence was insufficient to establish he committed the charged offenses for the benefit of, at the direction of, or in association with a criminal street gang, and with the specific intent to promote, further, or assist in criminal conduct by gang members.

**a.      Relevant legal principles**

We review the whole record in the light most favorable to the judgment to decide whether the evidence was sufficient to persuade a reasonable jury of guilt beyond a reasonable doubt.  (*People v. Ceja* (1993) 4 Cal.4th 1134, 1138.)  We presume the existence of every fact supporting the judgment that the jury could reasonably have deduced from the evidence and make all reasonable inferences that support the judgment.  (*People v. Barnes* (1986) 42 Cal.3d 284, 303; *People v. Catlin* (2001) 26 Cal.4th 81, 139.)

The "for the benefit of . . ." element essentially means that the crime must be "'gang related.'"  (*People v. Albillar* (2010) 51 Cal.4th 47, 60.)  "Not every crime committed by gang members is related to a gang."  (*Ibid*.)

**b.      Substantial evidence supported each challenged element**

The location, nature, and circumstances of the charged offenses, together with reasonable inferences therefrom, and the gang expert's testimony, constituted substantial evidence the charged offenses were committed for the benefit of the Neighborhood gang. Huynh and Nguyen sat in a car with the headlights on for about half an hour, not just within the territory of the Neighborhood gang, but near a house that was both the home of a member of the gang and a hangout or "crash pad" for that gang.  Defendant was present at that house and was a member of the Neighborhood gang.  Huynh and Nguyen did not know defendant and had never been in the area, and the jury could reasonably infer defendant did not know them.  Nothing indicated that Huynh or Nguyen engaged in any conduct—apart from their mere presence—that angered defendant or otherwise provoked the shooting.  The jury reasonably could have inferred from these

11

circumstances, coupled with Farias's expert testimony, that defendant viewed Huynh and Nguyen as a challenge or threat to the Neighborhood gang and its members, including defendant, and he therefore shot at Huynh and Nguyen to protect the gang's reputation and maintain its control over its territory. Thus, the motive for the crime was gang-related.

In addition, as Farias testified, a violent attack on "innocent civilians" potentially benefits the gang by intimidating the community, making witnesses less likely to report the gang members' crimes, thereby allowing the gang's members to "get away with it and continue with the same type of activity." Accordingly, sufficient evidence supported the "for the benefit . . ." element of the gang enhancement.

The same evidence and inferences provided substantial evidence defendant committed the charged offenses with the specific intent to promote, further, or assist in criminal conduct by gang members. The jury reasonably could have inferred defendant intended to maintain or enhance the gang's reputation for ruthlessness in order to further or assist the gang's ability to carry out other crimes in the future by intimidating the community and reducing the likelihood citizens would report the gang's criminal conduct to the police.

### 3. The trial court did not err by admitting photographs of defendant's tattoos.

As noted, five officers testified about defendant's tattoos and the prosecution introduced six photographs of the tattoos. Defendant did not object to admission of two photographs taken by Kolowski in August of 2008, depicting his hand and face. When the prosecutor asked Marella if he took photographs of defendant's tattoos, the court precluded an answer, citing Evidence Code section 352. The court twice sustained defendant's Evidence Code section 352 objections when the prosecutor attempted to mark as exhibits the photographs taken by Marella. After a discussion off the record and outside the presence of the jury, the court decided to admit the four photographs because no other "full frontal" photographs of defendant's tattoos had been admitted. The court stated, "They're not inflammatory. They just show tattoos."

Defendant contends the trial court erred by overruling his Evidence Code section 352 objection to the photographs taken by Marella.  He argues they "were cumulative, highly inflammatory, and more prejudicial than probative," and contends their admission violated due process.

a.    **Relevant legal principles**

We review any ruling on the admissibility of evidence for abuse of discretion. (*People v. Elliott* (2012) 53 Cal.4th 535, 577.)

Only relevant evidence is admissible.  (Evid. Code, § 350.)  Evidence is relevant if it has any tendency in reason to prove or disprove any disputed fact of consequence to the determination of an action.  (Evid. Code, § 210.)

Evidence Code section 352 provides that the court may, in its discretion, exclude relevant evidence if its probative value is substantially outweighed by the probability that its admission will either be unduly time consuming or create a substantial danger of undue prejudice, confusion of the issues, or misleading the jury.  In this context, unduly prejudicial evidence is evidence that evokes an emotional bias against the defendant without regard to its relevance to material issues.  (*People v. Kipp* (2001) 26 Cal.4th 1100, 1121.)

Photographs need not be excluded as cumulative simply because other evidence was introduced to prove the same facts.  (*People v. Crittenden* (1994) 9 Cal.4th 83, 134–135.)  "That the challenged photographs may not have been strictly necessary to prove the People's case does not require that we find the trial court abused its discretion in admitting them."  (*People v. Mills* (2010) 48 Cal.4th 158, 191.)

Applying the rules of evidence ordinarily does not violate due process.  (*People v. Cunningham* (2001) 25 Cal.4th 926, 998.)  The admission of evidence can violate due process if there is no permissible inference a jury may draw from the evidence.  (*People v. Steele* (2002) 27 Cal.4th 1230, 1246; *People v. Albarran* (2007) 149 Cal.App.4th 214, 229.)  The relevant inquiry is whether admission of the evidence in question was so

13

extremely unfair as to violate "'fundamental conceptions of justice.'" (*Dowling v. United States* (1990) 493 U.S. 342, 352 [110 S.Ct. 668].)

**b. The trial court did not abuse its discretion and the admission of the photographs did not violate due process**

Defendant's gang-related tattoos were relevant to establish both his membership in, and commitment to, the Neighborhood gang, which were in turn relevant to the mental state elements of the gang enhancement. We have reviewed all of the photographs of defendant's tattoos. The trial court's conclusion they were not inflammatory was not arbitrary, capricious, or patently absurd. Their admission created no substantial danger of undue prejudice because the jury had already heard Espleta, Morean, and Kolowski testify about defendant's various gang-related tattoos and had seen two other photographs of some of those tattoos. That testimony, however, did not require the trial court to exclude the photographs as cumulative. Indeed, the photographs provided valuable corroboration for the officers' testimony and for the expert's opinion defendant was a member of the Neighborhood gang. Because permissible inferences could be drawn from the photographs, their admission did not violate due process.

**4. Admitting evidence of gang graffiti observed in 2008, if error, was harmless.**

Defendant objected to Kolowski testifying about seeing fresh tagging near defendant and his five companions when she contacted them in Vista Verde Park on August 27, 2008, arguing this would show his commission of other crimes. The trial court overruled the objection but limited the prosecutor to establishing there was tagging near them. Kolowski then testified she noticed "fresh gang graffiti that said 'NBD' and had just gang stuff in the area. We couldn't do anything with it because nobody had witnessed it, and it's a misdemeanor."

Defendant contends this testimony was irrelevant, its admission violated Evidence Code section 1101, subdivision (a), and it rendered his trial constitutionally unfair.

**a. Evidence Code section 1101**

Evidence of other offenses or misconduct is inadmissible to prove criminal

14

propensity but may be admitted to prove matters such as motive, intent, identity, or a common design or plan.  (Evid. Code, § 1101, subds. (a), (b).)

**b.    Admission of the evidence, if error, was harmless**

Kolowski's testimony showed four of the six people in the park were Neighborhood gang members.  Any of them could have painted the graffito.  This uncertainty diminishes the relevance of the testimony, its tendency to reflect prior misconduct by *defendant*, and its prejudicial effect.  Any potential prejudice to defendant was eliminated by CALCRIM No. 1403, a limiting instruction regarding gang activity, which prohibited the jury from considering "evidence of gang activity" for any purpose other than (1) determining whether "defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related enhancements charged," (2) determining whether "defendant had a motive to commit the crimes charged," or (3) in evaluating the credibility of a witness or the facts and information an expert relied upon in reaching his or her opinion.  We presume jurors follow the trial court's limiting instructions.  (*People v. Waidla* (2000) 22 Cal.4th 690, 725.)  Accordingly, even if the trial court erred by admitting this evidence, its admission was harmless beyond a reasonable doubt and did not render defendant's trial unfair.

**5.    The trial court properly excluded vague testimony by a neighbor.**

Maria Dolores Rea had apparently phoned 911 about the charged shooting sometime after Huynh phoned.  Rea had been subpoenaed for trial, but did not appear.  A bench warrant was issued and a defense investigator continued to search for her throughout the trial.

In Rea's absence, the court addressed the admissibility of a transcript of an exchange between a dispatcher and a deputy regarding a phone call by "Dolores."  The dispatcher told the deputy, "'We had another informant called [*sic*] just within the last few minutes saying she saw somebody run from the yard of that two-story house into the house across the street.  I don't know if that's the house next door or actually across the

15

street.'"  The transcript ends after a deputy said he was about to phone Dolores at the number the dispatcher had provided.

The court noted the transcript reflected a time of 6:15 a.m., whereas the shooting was at 5:30 a.m.  It excluded the transcript as irrelevant and confusing.

Rea was finally located and appeared at trial after the case was submitted to the jury.  Outside the presence of the jury, she testified she was afraid to testify because she lived in the neighborhood in the two-story house next to the Acosta house where defendant was arrested.  In September of 2011 she was awakened by the sound of gunfire.  She looked out the window, then phoned the sheriff's department.  She reported seeing someone "run out of the yard of the two-story house and across the street."  The person had worn dark clothing, but she had not seen anything in the person's hands and did not know the person's gender.  She did not know where the person came from or "which direction that person was heading in."  She did not recognize anyone in the courtroom.

The trial court did not allow evidence to be reopened for Rea to testify.  It explained it stood by its original ruling and analysis, "except for the timing," and added the person's identity and "what this person was doing" were speculative and would tend to "confuse the issue."

Defendant contends the exclusion of Rea's testimony was error and violated his right to present a defense because it supported his defense theory that "the actual shooter fled from the scene and [defendant] was mistakenly identified by the victims."

**a.      Third party culpability evidence and the right to present a defense**

Evidence tending to show that someone other than the defendant committed the charged offense is admissible if it could raise a reasonable doubt about the defendant's guilt.  (*People v. Lewis* (2001) 26 Cal.4th 334, 372.)  There must be direct or circumstantial evidence linking the third person to the actual perpetration of the charged crime.  (*Ibid.*)  Evidence Code section 352 and all other requirements for admissibility are fully applicable to third party culpability evidence.  (*Lewis*, at p. 372.)

16

Proper application of the rules of evidence generally does not impermissibly infringe upon the defendant's right to present a defense. (*People v. Thornton* (2007) 41 Cal.4th 391, 443.) The right to present a defense does not permit a defendant to introduce irrelevant or marginally relevant evidence. (*People v. Babbitt* (1988) 45 Cal.3d 660, 684.)

**b.     Exclusion of the evidence was proper and did not infringe upon the right to present a defense**

Rea's proposed testimony was only marginally relevant and did not tend to show that someone other than defendant committed the charged shootings because the unidentified person Rea saw running may have been defendant. His later arrest at the Acosta house does not preclude the possibility he crossed the street to hide the gun at a different house or in a vehicle, then returned to the Acosta house. The patrol sergeant who supervised the response to the shooting, Glenn Emery, testified deputies arrived near the Acosta house about 10 to 15 minutes after contacting victims Huynh and Nguyen and set up the containment area 20 to 25 minutes after the "actual call [came] out." Thus, there was abundant time to cross the street and return. Alternatively, the person Rea saw might not have been the shooter, but an accomplice running to hide the shotgun or someone who had nothing to do with the shooting. Accordingly, the trial court properly excluded Rea's testimony, and its exclusion did not violate defendant's right to present a defense.

**6.     The trial court properly refused to instruct on the destruction of evidence.**

**a.     Proceedings in the trial court**

Before trial, defendant moved to dismiss the case or sanction the prosecution because, inter alia, defendant's GSR test kit had been destroyed. Judge Fournier conducted an evidentiary hearing at which Marella testified he initially was the investigating officer assigned to this case. Before Marella was transferred to a new position around January of 2012, he submitted two copies of a form directing defendant's GSR kit be retained as evidence, but, through an oversight, the copy of the form that should have been forwarded to the evidence clerk remained in the case file. As a result,

17

the evidence clerk did not know she should retain the evidence and disposed of it six months after it was booked, in accordance with the standard departmental practice. In February of 2012 Marella received an e-mailed "discovery request" from the original prosecutor and forwarded it to Farias, the new investigating officer on the case.

Farias testified she received a request from the trial prosecutor regarding the GSR kit in August of 2012. She spoke to the evidence clerks and learned the GSR kit had been destroyed.

In argument on the motion, defense counsel acknowledged that GSR results are not conclusive, but contended defendant's post-arrest statement to Marella that he was asleep in the house with Ibarra and their child made it "readily apparent" the GSR kit "was a crucial piece of evidence." Counsel requested a dismissal or a jury instruction regarding the destruction of evidence.

The trial court denied the motion to dismiss and denied the request for an instruction without prejudice, explaining no bad faith had been shown and the GSR results would have been neither inculpatory nor exculpatory.

At trial defendant renewed his request for instruction regarding the destruction of evidence and submitted five proposed instructions for the court's consideration. The court declined to so instruct, explaining the evidence was preserved for six months after defendant's arrest, and the defense had several months after trial counsel began representing defendant to request that the GSR kit be tested; the destruction of the evidence was neither malicious nor negligent, but resulted from nothing more than "the ordinary process of the sheriff's hulling [*sic*] out its evidence locker"; and it was "speculative as to what, if anything, it would prove." The court, however, permitted defendant to introduce evidence regarding the destruction and to argue it to the jury.

Defendant contends the trial court erred by refusing to instruct the jury regarding the destruction of the GSR kit, and this error violated due process.

18

### b. Relevant legal principles

"[A] trial court in a criminal case is required—with or without a request—to give correct jury instructions on the general principles of law relevant to issues raised by the evidence." (*People v. Mutuma* (2006) 144 Cal.App.4th 635, 640.)

As a matter of due process, law enforcement agencies have a duty to preserve evidence that might be expected to play a significant role in the suspect's defense. Such "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*California v. Trombetta* (1984) 467 U.S. 479, 488–489 [104 S.Ct. 2528].) If all a defendant can say about the unpreserved evidence is that it could have been tested and the results might have helped the defense, the defendant must show the police acted in bad faith in losing or disposing of the material. (*Arizona v. Youngblood* (1988) 488 U.S. 51, 57–58 [109 S.Ct. 333] (*Youngblood*).) Negligent destruction of, or failure to preserve, potentially exculpatory evidence, without evidence of bad faith, does not violate due process. (*Youngblood, supra*, 488 U.S. at p. 58.)

"The presence or absence of bad faith by the police . . . must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." (*Youngblood, supra*, 488 U.S. at p. 57, fn. *.) We review the trial court's finding on the existence or nonexistence of bad faith under the substantial evidence standard. (*People v. Velasco* (2011) 194 Cal.App.4th 1258, 1262.)

### c. The trial court properly refused to instruct the jury on destruction of the GSR kit

GSR can easily be removed from hands by washing, and defendant had ample time to wash his hands during the hour that elapsed from the shooting to his emergence from the Acosta house. Therefore, an absence of GSR particles on the test swabs would not have exonerated him. At best, such a result *might* have helped the defense in some small way. Accordingly, defendant was required to show the sheriff's department acted

in bad faith in disposing of the kit. Nothing in the record demonstrated bad faith, and Marella's testimony at both the pretrial hearing and at trial established the kit was, at worst, discarded as a result of negligence. Disposal of the kit did not violate due process, and the trial court properly refused to instruct the jury on it.

**7. The prosecutor did not engage in misconduct.**

Defendant contends the prosecutor committed misconduct in both argument and the introduction of evidence. As we will explain, we disagree.

**a. Pertinent prosecutorial misconduct principles**

Conduct by a prosecutor that does not violate a ruling by the trial court "is misconduct only if it amounts to 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury' [citations] or 'is so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.'" (*People v. Silva* (2001) 25 Cal.4th 345, 373.)

Intentionally introducing inadmissible evidence constitutes misconduct. (*People v. Scott* (1997) 15 Cal.4th 1188, 1218.)

If a prosecutorial misconduct claim is based on the prosecutor's arguments to the jury, we consider whether, considering the challenged statements in the context of the argument as a whole, there is a reasonable likelihood that the jury construed or applied any of the challenged statements in an objectionable fashion. (*People v. Cole* (2004) 33 Cal.4th 1158, 1202–1203 (*Cole*).) No misconduct exists if a juror would have taken the statement to state or imply nothing harmful. (*People v. Benson* (1990) 52 Cal.3d 754, 793.) "'[W]e "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.'" (*People v. Dykes* (2009) 46 Cal.4th 731, 772.)

A prosecutor has wide latitude to discuss, argue reasonable inferences from, and comment upon the evidence. (*Cole*, *supra*, 33 Cal.4th at p. 1203.) "'[C]ounsel can argue from the evidence that a witness's testimony is unsound, unbelievable, or even a patent lie.'" (*People v. Bennett* (2009) 45 Cal.4th 577, 615.) Although a prosecutor "may not

20

suggest that 'a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence'" (*People v. Young* (2005) 34 Cal.4th 1149, 1195–1196), comments on the state of the evidence or on the defense's failure to call logical witnesses, introduce material evidence, or rebut the People's case are permissible (*People v. Medina* (1995) 11 Cal.4th 694, 755).

A prosecutor may not suggest that matters outside the record establish the veracity of a witness; however, the prosecutor may assure the jury of a witness's apparent honesty or reliability based on matters in the record. (*People v. Padilla* (1995) 11 Cal.4th 891, 946, overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.)

To preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely objection at trial on the ground asserted on appeal and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm or objection would have been futile. (*People v. Thomas* (2012) 54 Cal.4th 908, 937.)

**b.      The prosecutor did not commit misconduct in introducing evidence**

**(1)      Ignoring the court's orders**

Defendant first argues the prosecutor "ignored the court's orders" with respect to evidence of defendant's tattoos. The first instance he cites occurred after the prosecutor asked Kolowski whether she saw any tattoos on defendant in August of 2008. The court interjected, "Well, at this time, 352. I would ask you to move on." The prosecutor asked Kolowski whether she photographed defendant, then introduced two photographs taken by Kolowski.

The second instance cited by defendant occurred after the prosecutor asked Farias if she was familiar with defendant's tattoos. Farias said she was. The court interjected, "That's all been asked and answered." The prosecutor explained, "I'm just going to ask what the Penal Code is that's on his hand, your honor." The prosecutor showed Farias a previously introduced photo, and Farias testified about the tattoo on defendant's hand. She then showed Farias a previously introduced photo of defendant's neck tattoos, and

21

Farias testified about them without objection. The prosecutor then showed Farias a third previously introduced photograph of defendant's tattoos and asked what they meant. As Farias began to answer, the court interjected, "That's all been testified to." The prosecutor replied, "I don't think this has." The court asked, "You don't think so?" The prosecutor responded, "No. I'm sorry." Farias then testified about defendant's "S" and "E," "Crooks," and "NBHD" tattoos.[4]

The prosecutor's conduct, at the very worst, was disrespectful toward the court and needlessly made defendant's trial a little longer. Although she persisted in eliciting evidence already introduced through other witnesses after the court attempted to move the trial along, she did not intentionally elicit inadmissible, as opposed to redundant, evidence. Redundancy cannot be deemed a deceptive or reprehensible method of persuasion or a matter infecting defendant's trial with unfairness. Furthermore, defendant did not object to either instance of the prosecutor's persistence, and the trial court, which maintained a firm grip on the progress of the trial, seemingly was persuaded to allow the questioning.

### (2) Introducing evidence of the 2008 gang graffito in the park

Defendant also argues introducing evidence of the fresh gang graffito Kolowski saw in the park in 2008 constituted misconduct. This also did not constitute intentionally introducing inadmissible evidence because the trial court overruled defendant's objection to the evidence and thus permitted it to be admitted.

### (3) Introducing the facts of the predicate offenses

Defendant argues the prosecutor also engaged in misconduct by "improperly" eliciting "unduly prejudicial" evidence of the facts underlying each of the predicate offenses introduced as part of the proof of the gang enhancement allegation. However, defendant did not object on any ground to testimony regarding the facts of the predicate

---

[4] The court was correct: Morean, the booking officer, had already testified about the meaning of these tattoos.

22

offenses, which were stated in a brief, summary fashion. He has cited no authority establishing a blanket exclusion of such facts. Accordingly, we cannot conclude the prosecutor intentionally introduced inadmissible evidence when she asked Farias about the nature of the predicate offenses.

### c. The prosecutor did not engage in misconduct during argument

#### (1) "Vouching" for Nguyen

Defendant argues the prosecutor vouched for Nguyen's honesty by saying she was "'extremely honest.'" He did not object to this argument at trial.

Considered in context, there is no reasonable likelihood the jury would have understood the prosecutor's statement about Nguyen's honesty to mean that matters outside the record established her veracity. The challenged statement followed a lengthy recitation of matters Huynh and Nguyen remembered about the crimes and the shooter, followed by argument that each remembered different details, but both were certain of their identifications at the showup and the preliminary hearing, and differences between their testimony showed they were not conspiring "to come in here [and] point the finger at the wrong person." The prosecutor then argued, "Now, [Nguyen] is extremely honest. She came in here and she told you she doesn't even remember today exactly what [defendant's clothing] was. . . . [¶] [Huynh] has maybe a more detailed memory than her. That's just the difference in the way that they remember things, the way that they observe things." The prosecutor continued, "[Nguyen] doesn't recognize him now. That's understandable. Look at him. He looks way different. Way different. She's being truthful. If she wanted to come in here and pin it on the wrong guy, don't you think she would have said, yeah, that's him? She didn't do that. She came in here and said she doesn't recognize him. And, again, that's understandable. He looks a whole lot different."

In context, the jury would have understood that the prosecutor's characterization of Nguyen as "extremely honest" was based upon matters in the record and reasonable inferences therefrom, such as Nguyen's admissions she could not remember particular

details about the culprit's clothing and did not recognize defendant at trial. There was no vouching.

### (2)   Asking why defense did not call other witnesses

Defendant argues the prosecutor improperly shifted the burden of proof to defendant by asking why the defense did not call as witnesses other people who were in the house with defendant and Ibarra.

In her rebuttal argument, the prosecutor stated the following: "[C]ounsel stated Ms. Ibarra's truthful. I expected maybe for him to address some of her inconsistencies in front of you. I don't know if he just doesn't want to touch it. . . . [¶] She is not a credible witness. . . . She obviously wants the father of her child to not be convicted of a crime. I understand that. Everyone does. It doesn't make her credible. . . . [A]nd I think what you saw from her shows exactly the opposite. . . . She's told you multiple lies. She didn't want to answer questions. . . . [¶] First she says to the cops on scene that she didn't hear shots. . . . And then next she has this other story about how she heard shots, she got up, and then she thought they were in the riverbed. Right? Because she's trying to distance the shots from her boyfriend. . . . [¶] . . . [¶] She also then wants you to believe that she heard gunshots right by her house where her infant is sleeping, got up, checked everyone, thought nothing of it and just went back to bed, no problem? That's not reasonable either. . . . [¶] . . . [¶] And then if she is telling the truth—and, again, I'm only going to comment on the defense case because I have met my burden—but why didn't they call any other witnesses? If she is telling the truth, wouldn't the other people in that house back her up? [¶] Where is Lisbet? . . . [¶] What about Adrian? . . . Why doesn't he come in here? . . . He could come in and say, no, he was with me the whole time. . . . [¶] He didn't come in here. No one came in here to back up her story because she's lying."

In context, there is no reasonable likelihood the jury would have understood the prosecutor's argument to have meant defendant had a duty or burden to produce evidence, or a duty or burden to prove his own innocence. Her argument was nothing

more than commentary upon the defense's failure to call other individuals who were extracted from the house with defendant and were purportedly inside the house with him at the time of the shots. All of them were logical witnesses, especially given factors adversely reflecting upon Ibarra's credibility. In addition, throughout her argument, the prosecutor repeatedly reminded the jury that she had the burden of proving the charges and enhancements beyond a reasonable doubt.

**8. Defendant has not established ineffective assistance of counsel.**

Defendant contends his trial attorney was constitutionally ineffective by failing to object to various matters. We disagree, as explained below.

### a. Relevant legal principles

A claim that counsel was ineffective requires a showing, by a preponderance of the evidence, of objectively unreasonable performance by counsel and a reasonable probability that, but for counsel's errors, the defendant would have obtained a more favorable result. (*In re Jones* (1996) 13 Cal.4th 552, 561.)

Counsel's failure to make a futile or unmeritorious motion, objection, argument, or request is not ineffective assistance. (*People v. Price* (1991) 1 Cal.4th 324, 387.)

### b. Defendant has not shown deficient performance or prejudice

#### (1) Failure to object to gang enhancement

Defendant contends his attorney rendered ineffective assistance by failing "to object to" or move to dismiss the gang allegation on the ground the crimes were not gang-related. Counsel unsuccessfully moved to dismiss the enhancement allegation at the preliminary hearing as unsupported by evidence. Defendant does not suggest what other particular actions counsel could or should have taken. In any event, because the crimes clearly were gang-related and sufficient evidence supports the gang enhancement allegation, defendant has not shown a reasonable probability he would have obtained a more favorable result if his attorney had "objected" to, or moved to dismiss, the enhancement allegation.

25

### (2) Failure to object to gang evidence

Defendant also contends his attorney rendered ineffective assistance by failing to object to "the plethora of irrelevant, cumulative and highly inflammatory gang evidence." In particular, he argues counsel should have objected to the following: Five witnesses testified regarding his tattoos; the prosecutor, Marella, and Farias all referred to defendant's index finger as his "'trigger finger'" when testifying about the "187" tattoo he had there; Farias testified Acosta rented his garage to gang members to use as a "'crash pad'" where they used and sold drugs, hid weapons, and planned crimes; Farias testified about the facts of the predicate offenses; and Farias testified that one of several photos depicting defendant and others making Neighborhood gang hand signs was seized during a probation search at Robert Moncivais's house.

Even if we assume, for the sake of argument, defense counsel's failure to object to these matters constituted objectively unreasonable performance, defendant has not shown a reasonable probability he would have obtained a more favorable result if counsel had objected. Although the prosecutor elicited the gang evidence in a piecemeal, somewhat redundant fashion, the entirety of it was nonetheless relatively brief and highly relevant. The gang evidence also was not inflammatory, especially in comparison to defendant's conduct in committing the charged offenses. The trial judge demonstrated sensitivity to the potential for prejudice to defendant and diligently curbed the prosecutor's tendency to over-prove her case. Even if objection by defense counsel had resulted in exclusion of some or all of the gang evidence defendant highlights, there is no reasonable probability the jury would have concluded that defendant's conduct in shooting multiple times at two young strangers who simply were sitting in a car outside a gang crash pad was not a gang-related offense.

### (3) Failure to object to prosecutorial misconduct

Defendant also contends his attorney's failure to object to the numerous purported instances of prosecutorial misconduct was constitutionally ineffective. Our conclusion that there was no prosecutorial misconduct defeats this claim.

26

## DISPOSITION

The judgment is reversed and the cause is remanded to the trial court for a hearing to determine the merits of defendant's motion to suppress. If the motion is denied in full, the trial court shall reinstate the judgment.

NOT TO BE PUBLISHED.


                                        MILLER, J.*

We concur:


    CHANEY, Acting P. J.


    JOHNSON, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

27