[No. F014967. Fifth Dist. Jan. 8, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
LORENZO PATINO MORENO, Defendant and Appellant.

COUNSEL

Gordon S. Brownell, under appontment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Acting Assistant Attorney General, and W. Scott Thorpe, Deputy Attorney General, for Plaintiff and Respondent.

OPINION

STONE (W. A.), Acting P. J.—In this case we address a question not previously answered in California: Does a baby-sitter have standing to move to suppress the items seized at the place and during the time the baby-sitter sits? We answer the question affirmatively.

THE CASE

An information charged Lorenzo Patino Moreno with offering to sell, conspiracy to sell, and possession for sale of cocaine; it alleged he was armed with a firearm in the commission of the first two crimes. The defense filed a motion to suppress evidence (Pen. Code, § 1538.5),[1] which the trial court denied. Thereafter a jury convicted Moreno of all counts and found true the armed allegations.

[1]All further statutory references are to the Penal Code unless otherwise indicated.

## The Facts

Our review is limited to those matters before the trial court—Moreno's "Notice of Motion and Motion to Suppress" and accompanying points and authorities, the People's "Response in Opposition to Motion to Suppress Evidence," and brief testimony and argument presented at the hearing on the motion. Both the points and authorities and the response contained facts drawn from the preliminary examination transcript. However, the transcript itself was not introduced into evidence, Moreno having refused to stipulate to its use.

The motion sought to "suppress all evidence seized as a result of the search of the residence located at 2412 W. Dennett, #103, on or about June 22, 1990." According to the points and authorities, on that date, while Moreno was an occupant, Fresno police officers entered and searched the premises without a warrant. Officer Flores then obtained a telephonic warrant authorizing the search of Ismael Moreno (Moreno's brother, hereinafter Ismael) and the occupants of the premises. Testimony at the preliminary examination disclosed large quantities of cocaine and packaging paraphernalia were found in two bedrooms along with income tax returns and a joint safety deposit box receipt bearing Moreno's name.

The defense asserted, inter alia, the original entry and search were invalid and the affidavit supporting the warrant was based on information obtained during the original warrantless entry and search; therefore, the evidence seized pursuant to the warrant was the fruit of the poison tree. The prosecution asserted the original entry and search were valid; in any event, even excluding information based on the original entry and search, the affidavit contained probable cause for the warrant; and, finally, Moreno had not established standing to challenge the search.

At the hearing on the motion Moreno's counsel noted both parties had "filed points and authorities, and we're probably prepared to submit it on that unless the Court wants some information, for instance, regarding standing, if you have any questions about that or any problem with standing in this case." The court indicated it wanted to hear testimony concerning Moreno's standing.

Moreno, the sole witness, testified he arrived at his brother Ismael's apartment around 7 p.m., June 22, 1990. Ismael asked Moreno to take care of his young son while Ismael went to the store. Moreno intended to go to his own house to sleep when Ismael returned. The boy was asleep in the living room and Moreno was sitting on the living room sofa when the

officers arrived about 7:30 p.m. Moreno did not enter any bedroom that evening.

Defense counsel argued Moreno was more than a "casual guest" and, therefore, had a legitimate expectation of privacy which was violated by the warrantless entry of the police. The prosecutor countered Moreno had no such expectation; he was "a mere brief guest to watch this child for a brief period of time while his brother was gone to the store." Alternatively, the prosecutor contended any expectation of privacy was limited to the living room area and did not extend to "any bedroom searched."

The court found "[Moreno] was apparently visiting for a brief period to baby-sit his brother's child. There's no standing."

DISCUSSION

I. *Fruit of the Poison Tree Doctrine*

■ If initial entry into a house violates a defendant's Fourth Amendment rights, any evidence found in the ensuing warrantless search is "fruit of the poison tree." (*Wong Sun* v. *United States* (1963) 371 U.S. 471, 484 [9 L.Ed.2d 441, 452, 83 S.Ct. 407]; *People* v. *Hernandez* (1988) 199 Cal.App.3d 1182, 1187 [245 Cal.Rptr. 513].) In *Hernandez,* after an occupant consented to a search of a house in which a different person occupied each bedroom, police found evidence in one bedroom. Defendants challenged the initial entry. The court noted:

"Defendants argue that Rodriguez's consent to search the house . . . was involuntarily given . . . . If this argument is correct, the police had no authority to enter the house and any evidence seized from within should have been excluded." (199 Cal.App.3d at p. 1187.)

On the merits, the *Hernandez* court held substantial evidence supported a finding of consent to search the house and the two defendants excluded from the subject bedroom lacked standing to object to any search that might have occurred there. (*People* v. *Hernandez, supra,* 199 Cal.App.3d at pp. 1188, 1190.) However, the court recognized all evidence would have been suppressed had the initial entry been unauthorized. (*Id.* at p. 1187.)

The same principle appears in *U.S.* v. *Erwin* (10th Cir. 1989) 875 F.2d 268, in which the defendant attacked the initial stop and subsequent search of a car. The court explained: "We believe that standing to challenge a stop

presents issues separate and distinct from standing to challenge a search. Thus, defendant's challenge to the stop and search must be examined separately.[2]" (*Id.* at p. 269.) Footnote 2 to the quoted passage provides: "Even if defendant lacks standing to challenge the search of the car, if the initial stop was illegal, the seized contraband is subject to exclusion under the 'fruit of the poison tree' doctrine. [Citations.]"

Because we determine the initial entry intruded on Moreno's reasonable expectation of privacy in the apartment generally, and thus he had standing to challenge the search, we do not reach the question whether the warrantless search of the particular bedrooms also violated his legitimate expectation of privacy.

## II. *Standing: Jones to Rakas to Olson*

 "The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure. [Citations.]" (*Rakas* v. *Illinois* (1978) 439 U.S. 128, 131, fn. 1 [58 L.Ed.2d 387, 393, 99 S.Ct. 421]; see also *People* v. *Ybarra* (1991) 233 Cal.App.3d 1353, 1360 [285 Cal.Rptr. 200]; *People* v. *Koury* (1989) 214 Cal.App.3d 676, 685 [262 Cal.Rptr. 870].)

In *Jones* v. *United States* (1960) 362 U.S. 257 [4 L.Ed.2d 697, 80 S.Ct. 725, 78 A.L.R.2d 233], the Supreme Court held "anyone legitimately on premises where a search occurs may challenge its legality . . . ." (*Id.* at p. 267 [4 L.Ed.2d at p. 706].) In *Rakas* v. *Illinois, supra,* 439 U.S. 128, the court held "the phrase 'legitimately on premises' coined in *Jones* creates too broad a gauge for measurement of Fourth Amendment rights." (*Id.* at p. 142 [58 L.Ed.2d at p. 400], fn. omitted.) "We think that *Jones* on its facts merely stands for the unremarkable proposition that a person can have a legally sufficient interest in a place other than his own home so that the Fourth Amendment protects him from unreasonable governmental intrusion into that place." (*Id.* at p. 142 [58 L.Ed.2d at p. 400].)

 "[C]apacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place. [Citations.]" (*Rakas* v. *Illinois, supra,* 439 U.S. at p. 143 [58 L.Ed.2d at p. 401].) What the moving party must show is " '. . . an actual (subjective) expectation of privacy,' . . . [and the] subjective expectation of privacy is 'one that society is prepared to recognize as "reasonable," ' . . ." (*Smith* v. *Maryland* (1979) 442 U.S. 735, 740 [61 L.Ed.2d 220, 226-227, 99 S.Ct. 2577], quoting *Katz* v. *United*

*States* (1967) 389 U.S. 347, 361 [19 L.Ed.2d 576, 587-588, 88 S.Ct. 507].)
▮ "Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law *or to understandings that are recognized and permitted by society*. One of the main rights attaching to property is the right to exclude others, see W. Blackstone, Commentaries, Book 2, ch. 1, and one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude. Expectations of privacy protected by the Fourth Amendment, of course, need not be based on a common-law interest in real or personal property, or on the invasion of such an interest." (*Rakas* v. *Illinois, supra,* 439 U.S. at p. 144, fn. 12 [58 L.Ed.2d at p. 401], italics added.)

In *Minnesota* v. *Olson* (1990) 495 U.S. 91 [109 L.Ed.2d 85, 110 S.Ct. 1684], the Supreme Court held "Olson's status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable." (495 U.S. at pp. 96-97 [109 L.Ed.2d at p. 93, 110 S.Ct. at p. 1688].) "To hold that an overnight guest has a legitimate expectation of privacy in his host's home merely recognizes the everyday expectations of privacy that we all share. Staying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society." (495 U.S. at p. 98 [109 L.Ed.2d at p. 94, 110 S.Ct. at p. 1689].)

The Supreme Court relied heavily on a paradigm of the overnight guest-host relationship, drawn from common knowledge and experience—not from evidence in the record regarding the particular relationship and understanding between Olson and his host:

"That the guest has a host who has ultimate control of the house is not inconsistent with the guest having a legitimate expectation of privacy. The houseguest is there with the permission of his host, who is willing to share his house and his privacy with his guest. It is unlikely that the guest will be confined to a restricted area of the house; and when the host is away or asleep, the guest will have a measure of control over the premises. The host may admit or exclude from the house as he prefers, but it is unlikely that he will admit someone who wants to see or meet with the guest over the objection of the guest. On the other hand, few houseguests will invite others to visit them while they are guests without consulting their hosts; but the latter, who have the authority to exclude despite the wishes of the guest, will often be accomodating. The point is that hosts will more likely than not respect the privacy interests of their guests, who are entitled to a legitimate expectation of privacy despite the fact that they have no legal interest in the

premises and do not have the legal authority to determine who may or may not enter the household." (*Minnesota* v. *Olson, supra,* 495 U.S. at p. 99 [109 L.Ed.2d at p. 95, 110 S.Ct. at p. 1689].)

### III. *The Baby-sitter's Standing*

█ Like staying overnight as a guest, baby-sitting is a sufficiently common phenomenon to permit certain basic generalizations. A baby-sitter is "[s]omeone engaged to care for one or more children when the parents are not at home." (The American Heritage Dict. of the English Language (new college ed. 1981) p. 96.) Baby-sitting has numerous aspects—the consideration for the sitter's services, if any, the place where the services are provided, and the duration of the engagement are but a few. Whatever the arrangements of a particular instance, however, as a general rule, the baby-sitter is in exclusive charge of the child and the premises.

This exclusive control distinguishes the baby-sitter from the overnight guest. By definition the baby-sitter and the parent or guardian will not be present in the same house at the same time, other than at the time of the "changing of the guard."[2] The normal purpose of baby-sitting is to free the parent from the child and the house. Thus, the baby-sitter who comes to the child's home will likely have, unlike the overnight guest, the exclusive right to "determine who may or may not enter the household." (*Minnesota* v. *Olson, supra,* 495 U.S. at p. 99 [109 L.Ed.2d at p. 95, 110 S.Ct. at p. 1689].)

█ █ █ Control alone brings the baby-sitter within the *Rakas* principle that "[o]ne of the main rights attaching to property is the right to exclude others, . . . and one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude." (*Rakas* v. *Illinois, supra,* 439 U.S. at p. 144, fn. 12 [58 L.Ed.2d at p. 401].)[3]

In addition, a baby-sitter is responsible for addressing the child's needs in their infinite variety, from mundane matters to emergencies. As circumstances warrant, the baby-sitter normally has the flexibility to go to any and

---

[2] While in some instances a parent may employ a baby-sitter to be in the home at the same time as a parent or other adult simply to relieve the parent or other adult from child care responsibilities for a time, this is not such a case.

[3] The "right to exclude" is one of the factors considered in federal and California cases looking to the "totality of circumstances" to determine whether a defendant has a legitimate expectation of privacy in the premises of another. The factors include " 'whether the defendant has a [property or] possessory interest in the thing seized or the place searched; whether he has the right to exclude others from that place; whether he has exhibited a subjective expectation that it would remain free from governmental invasion, whether he took normal precautions to maintain his privacy and whether he was legitimately on the premises.' " (*United States* v. *Briones-Garza* (5th Cir. 1982) 680 F.2d 417, 420, quoting *United States* v. *Haydel* (5th Cir. 1981) 649 F.2d 1152, 1155; see also *People* v. *Ybarra, supra,* 233 Cal.App.3d

all parts of the residence in order to discharge his or her duties. Like "[s]taying overnight in another's home," baby-sitting "is a longstanding social custom that serves functions recognized as valuable by society." (*Minnesota* v. *Olson, supra,* 495 U.S. at p. 98 [109 L.Ed.2d at p. 94, 110 S.Ct. at p. 1689].) Indeed, the baby-sitter has responsibilities the overnight guest never encounters.

Our inquiry reveals the Connecticut Superior Court has dealt with the issue in *State* v. *Anonymous (1984-1)* (1984) 40 Conn.Sup. 20 [480 A.2d 600, 608-609]. That case, as does ours, involved a baby-sitter sitting on a couch in the living room at the time of police entry. The sitter had remained overnight and was dressing her charge the following morning. The child's parents were asleep in an upstairs bedroom. (*Id.* at p. 602.) The court held the sitter had standing to object to a search pursuant to warrant where the police failed to comply with the "knock and announce" rule. The court reasoned: "As the caretaker of the child, P undoubtedly had a socially acceptable expectation of privacy. A babysitter has an obligation to protect her charge from harm. Of necessity, this obligation entitled her to exclude others from the premises. *Rakas* v. *Illinois, supra,* 143-44, n. 12 . . . ." (*Id.* at p. 609; see also, Annot. Nature of Interest in, or Connection With, Premises Searched as Affecting Standing to Attack Legality of Search (1961) 78 A.L.R.2d 246, A.L.R.2d (Later Case Service 1991 pocket supp.) § 14, Employees, p. 16; and *State* v. *Cruz* (Kan.App. 1991) 809 P.2d 1233, 1239.) Again citing *Rakas* v. *Illinois,* the Connecticut court anticipated the 1990 holding in *Minnesota* v. *Olson* and held an overnight guest (a cousin of one of the occupants) also had a reasonable expectation of privacy in the residence. (480 A.2d at p. 609.)[4]

Respondent seeks to distinguish the facts of *State* v. *Anonymous (1984-1)* from those of Moreno's case by arguing the Connecticut baby-sitter had standing separate from her status as a baby-sitter—she was also an overnight guest, and therefore, had standing by virtue of *Olson.* However, respondent acknowledges the Connecticut opinion draws no such distinction.

If we are to examine foreign state holdings, respondent would have us follow *State* v. *Fillyaw* (1981) 104 Wis.2d 700 [312 N.W.2d 795] (cert. den.

at p. 1360; *People* v. *Koury, supra,* 214 Cal.App.3d at p. 686; *People* v. *Hernandez, supra,* 199 Cal.App.3d at p. 1189.)

[4]In *United States* v. *Minis* (5th Cir. 1982) 666 F.2d 134, a "caretaker" case, the court recognized but did not decide the issue: "The district court held that Minis had standing to assert the Fourth Amendment violation, having a legitimate expectation of privacy in the premises searched, because he was the caretaker of the entire premises [six-acre rural residence where contraband found]. Although the government moved for reconsideration of the 'standing' decision, which motion was denied, they do not raise the 'standing' issue on appeal, and we therefore do not consider it here." (*Id.* at p. 137, fn. 7.)

*Fillyaw* v. *Wisconsin* (1982) 455 U.S. 1026 [72 L.Ed.2d 147, 102 S.Ct. 1730]). In *Fillyaw*, published prior to *Olson*, the trial court denied defendant's motion to suppress objects of physical evidence found in the apartment of the victim, his girlfriend. Defendant claimed to have been baby-sitting his girlfriend's children and, when she failed to return, he spent the night.

While the Wisconsin court affirmed the denial of the motion to suppress, it noted the police conducted the searches of the apartment while defendant was away from the premises. Therefore, Fillyaw had no reasonable expectation of privacy. The court acknowledged Fillyaw "may have had a limited expectation of privacy while he was present in the apartment babysitting, . . ." (*State* v. *Fillyaw*, *supra*, 312 N.W.2d at p. 802.) Accordingly, although *State* v. *Fillyaw*, under its particular facts, holds defendant had no reasonable expectation of privacy in the apartment searched, additional discussion recognizes a baby-sitter does have such an expectation while he or she is in the course of caring for children on the premises while the search takes place.

Respondent further cites *People* v. *Ooley* (1985) 169 Cal.App.3d 197 [215 Cal.Rptr. 112], in which this court stated: "The sum of the evidence before the trial court was that a Jerry Phillips and his family occupied room 108, that a person resembling defendant had been seen in that area, and the officers' entry and arrest of defendant. Although defendant was on the searched premises, he failed to prove an invasion of any legitimate expectation of privacy in apartment 108 . . . ." (*Id.* at p. 203.)

Relying on *Ooley*, respondent argues Moreno "established at most merely his legitimate presence on the searched premises by invitation." However, the many unique features of the baby-sitter role transcend the bare fact of simply being on the premises at a particular point in time.

Respondent argues Moreno's "alleged status [as a baby-sitter] by itself did not establish a right to exclude all persons who might seek to enter the apartment. Nor did it in any way demonstrate a subjective expectation that the police would not enter or show any precautions taken to maintain privacy." Respondent notes also Moreno "denied any property or possessory interest in his brother's apartment, except insofar as his alleged baby-sitter status imparted a temporary and very short-term possessory interest. He did not show unencumbered access to the premises."

Respondent's repeated references to Moreno's "alleged baby-sitter status" overlook the fact Moreno's brief testimony was uncontradicted and his status

essentially conceded. Concerning the right to exclude, this court can draw on common knowledge and experience about the essential features of the baby-sitter role, just as the Connecticut Superior Court did in *State* v. *Anonymous (1984-1)* and as the Supreme Court did with the houseguest role in *Olson*. In any event, *Minnesota* v. *Olson, supra,* 495 U.S. at pages 98-100 [109 L.Ed.2d at pp. 94-95, 110 S.Ct. at pp. 1689-1690], specifically holds standing does not depend on the right to exclude.

Both *Rakas* and *Olson* make clear a property or possessory interest is not essential to establish a legitimate expectation of privacy. Similarly, the short-term nexus between Moreno and the apartment did not, by itself, undermine his otherwise legitimate expectation of privacy since he was present when the intrusion occurred.

By way of analogy, in *People* v. *Leonard* (1987) 197 Cal.App.3d 235 [242 Cal.Rptr. 757], this court recognized "[a] person . . . who has the owner's permission to use a vehicle and is exercising control over it has a legitimate expectation of privacy in it. [Citations.]" (*Id.* at p. 239; accord, *United States* v. *Griffin* (7th Cir. 1984) 729 F.2d 475, 483, fn. 11 [defendants exercising exclusive control on the evening of the search over another person's car "had standing to claim that the inventory search of the 1982 Corvette violated their privacy rights under the Fourth Amendment."].)[5] Courts consistently have given greater Fourth Amendment protection to a residence than to a vehicle. (*United States* v. *Ross* (1982) 456 U.S. 798, 805 [72 L.Ed.2d 572, 581-582, 102 S.Ct. 2157]; *Carroll* v. *United States* (1925) 267 U.S. 132, 149-153 [69 L.Ed. 543, 549-554, 45 S.Ct. 280, 39 A.L.R. 790].) Because a permissive user in temporary control of a *vehicle* has a protectable expectation of privacy, all the more reason exists to give protection to a permissive occupant who temporarily controls a *residence*, while performing "functions recognized as valuable by society." (*Minnesota* v. *Olson, supra,* 495 U.S. at p. 98 [109 L.Ed.2d at p. 94, 110 S.Ct. at p. 1689]; *State* v. *Anonymous (1984-1), supra,* 480 A.2d at p. 609.)

Finally, when the Fourth Amendment intrusion at issue is the initial entry into a dwelling, respondent does not explain why sitting on the living room couch is insufficient to invoke one's subjective expectation of privacy in the residence. (See *State* v. *Anonymous (1984-1), supra,* 480 A.2d at p. 609.)

Respondent offers no persuasive reason why Moreno did not have a legitimate expectation of privacy in his brother's apartment, such that he has

---

[5]An expectation of privacy in a vehicle must be distinguished from a person's expectation regarding freedom from an initial illegal stop of the vehicle. "Even if defendant lacks standing to challenge the search of the car, if the initial stop was illegal, the seized contraband is subject to exclusion under the 'fruit of the poison tree' doctrine. [Citations.]" (*U.S.* v. *Erwin, supra,* 875 F.2d at p. 269, fn. 2.)

standing to complain about a warrantless entry which occurred while he was present on the premises in a baby-sitting capacity.

The trial court erred when it denied the motion to suppress for lack of standing and failed to reach the merits of the motion.

### DISPOSITION

The judgment is reversed. The matter is remanded to the superior court for a hearing to determine the merits of appellant's motion to suppress. If the motion is denied, the superior court shall reinstate the judgment. If the motion is granted, the case shall be set for further proceedings.

Vartabedian, J., and Harris, J., concurred.