2018 IL App (1st) 160812

THIRD DIVISION
December 28, 2018

No. 1-16-0812

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 9109 |
| | ) | |
| OTIS MCCAULEY, | ) | Honorable |
| | ) | Carol M. Howard, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Justices Howse and Cobbs concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant Otis McCauley was convicted after a bench trial of delivery of a controlled substance and possession of a controlled substance with intent to deliver. Defendant sold drugs to an undercover officer inside the home of Tiny Barry, for whom defendant regularly performed housework. Shortly after that transaction, the undercover officer's partners returned to Barry's house to arrest defendant. The details of that encounter were a matter of dispute, but at some point, the officers entered Barry's house, without a warrant, and seized some more drugs from a table in the foyer.

¶ 2    The trial court denied defendant's motion to suppress, finding that he "lacked standing" to challenge the warrantless entry (*i.e.*, search) and seizure of the drugs, since he did not live in Barry's house and was merely an "invitee."

- 1 -

¶ 3    Defendant argues that he had a reasonable expectation of privacy in Barry's house. So unless exigent circumstances justified the warrantless entry and seizure, the drugs seized from the table in the foyer must be suppressed. (Perhaps other evidence, too, defendant says—such as the undercover officer's on-scene identification of defendant, and prerecorded funds seized from defendant during a search incident to his arrest.) The trial court, having denied the motion on "standing" grounds, did not decide whether there were exigent circumstances. Defendant thus asks that we remand for the trial court to do so.

¶ 4    The trial court's reasoning was legally erroneous. But defendant did not carry his burden of establishing that he had a reasonable expectation of privacy in Barry's house. We thus affirm the denial of his motion to suppress. We also vacate his $250 DNA fee.

¶ 5                                BACKGROUND

¶ 6    At defendant's bench trial, Officer Angela Pittman, the undercover buy officer, testified first for the State. When she finished testifying, defense counsel asked for leave to file a "motion to quash and suppress evidence." Counsel did not specify what evidence the defense sought to suppress. But the motion was based on Officer Pittman's testimony that defendant was arrested outside, rather than inside, Barry's house. (According to counsel, that testimony conflicted with the police reports, and thus revealed a basis for suppression that counsel was not aware of prior to the trial.) So the theory of the motion—at least as the trial court paraphrased it—was that the officers could not enter the house and seize the drugs, after arresting defendant outside, without a warrant.

¶ 7    The trial court suspended the trial to hear evidence on the motion. That evidence included the testimony of Officer Michael Clemons, who testified for the State, and defendant.

¶ 8     Officer Pittman testified that on April 30, 2014, she was assigned to an undercover narcotics detail with Officer Clemons and Officer John Zinchuk. Around 10:30 a.m., the officers went to the 5600 block of South Elizabeth Avenue. Officer Pittman spoke to a man on the street about purchasing cannabis. The man directed her to a specific house on that block and told her to knock on the window. When she did, defendant opened the front door. Officer Pittman asked to buy six bags of cannabis. Defendant went inside, and Officer Pittman followed at his invitation. The house was empty, except for a table in the entry foyer, a couple of feet from the front door. Officer Pittman did not see anyone but defendant inside.

¶ 9     Defendant walked over to the table. There were several bags on the table, containing various substances that Officer Pittman suspected to be cannabis, heroin, and crack cocaine. She asked defendant to exchange one bag of cannabis for one bag of heroin. Defendant obliged. Officer Pittman gave defendant $60 in pre-recorded funds, in exchange for the six bags; left the house; and signaled to her partners that the buy had been completed.

¶ 10    Officer Clemons testified that he went to the front door after receiving the signal from Officer Pittman. Defendant opened the door. Officer Pittman radioed her partners and identified defendant as the person who sold her drugs. Defendant was soon arrested, but the officers gave conflicting accounts of precisely where the arrest was made.

¶ 11    Officer Pittman testified that the front door was open and defendant was standing outside the house. Specifically, defendant was on the porch—both when she identified him and when her partners arrested him. It was *after* the arrest that her partners went inside the house.

¶ 12    Officer Clemons testified that defendant was about to step outside but never did. While defendant was still "standing in the doorway," he must have seen Officer Clemons on the porch,

because he tried to run back inside. Officer Clemons and another officer (whom he did not name) grabbed defendant. A "struggle" ensued, and they all "fell back into the doorway."

¶ 13    Officer Clemons testified that a table with several bags of "different types of [suspected] narcotics" was located just to the right of the front door, and was clearly visible from the porch when defendant opened the door.

¶ 14    Defendant testified that the house belonged to Tiny Barry, who lived there with her two sons. Defendant did not live there. But he helped out around the house as often as three times a week. He cleaned the house, fed the dog, and cleaned out the dog's cage. On the day in question, Barry was in the process of moving, and she had asked defendant to help her clean and pack. According to defendant, there were various items of furniture and moving boxes throughout the house, including several boxes next to the front door.

¶ 15    Defendant was in the kitchen, feeding the dog and cleaning the dog's cage, when Officer Pittman knocked on the window. Defendant opened the door, and Officer Pittman asked to buy some cannabis. Defendant "told her there ain't no weed in this house" and closed the door.

¶ 16    Defendant estimated that the officers returned about 23 minutes later. Defendant opened the door halfway and remained inside while he talked to them. Soon, a total of five or six officers "bum-rushed the house," pushed him back, and came inside. The officers searched the entire house, including the kitchen, the bedrooms, and the moving boxes.

¶ 17    Defendant denied that there were drugs on the table. Rather, after the officers searched the house and went through Barry's moving boxes, Officer Pittman announced that she found money and drugs. (Officer Pittman, for her part, denied that she went back inside the house after completing the initial transaction.)

¶ 18    There was no dispute that the officers did not have either a search warrant or an arrest warrant when they entered Barry's house.

¶ 19    After defendant testified, the trial court heard arguments on the motion to suppress. The parties principally disputed whether defendant had a reasonable expectation of privacy in Barry's house, based on his regular performance of chores on her behalf. The trial court found, on this basis, that defendant was an "invitee" in Barry's house. An "invitee," the trial court held, may challenge a search of any "personal effects" he may have left in "the room in which he is sleeping," but an "invitee" lacks "standing to challenge the search of the entire house." The trial court denied the motion, and the trial resumed.

¶ 20    The State called Officer Zinchuk as its final witness. He testified that defendant was detained on the front porch while trying to run back inside. Officer Zinchuk searched defendant and recovered the pre-recorded funds used by Officer Pittman to buy the drugs. He also recovered 4 bags of heroin, 6 bags of cocaine, and 9 bags of cannabis from a table by the front door. Those drugs were clearly visible from the doorway. The house was "vacant," and looked like it was "under construction." Officer Zinchuk did not recall seeing anything inside except the table with the drugs on it; and to his knowledge, none of the officers searched the entire house.

¶ 21    The parties stipulated, among other things, that the items purchased by Officer Pittman tested positive for 1.5 grams of heroin, and that the items recovered from the house tested positive for 0.4 grams of heroin and 0.1 grams of cocaine.

¶ 22    At the close of evidence, the defense renewed its motion to suppress. The trial court adhered to its ruling that defendant "lacked standing" to challenge the warrantless entry and search, because he was simply "cleaning the house" and "wasn't residing there."

¶ 23    The trial court found defendant guilty of delivery of a controlled substance (heroin) and

two counts of possession of a controlled substance with intent to deliver (heroin and cocaine).

The trial court found that the officers seized drugs from "the same table that the defendant went

to to retrieve the drugs that he sold [Officer] Pittman"—and thus not from a wholesale search of

the house, as defendant had testified. In its findings, the trial court also noted that "there is some

dispute as to how [the officers] entered" Barry's house. But the court never definitively resolved

that dispute. Instead, the court briefly summarized some of the testimony on this point and

immediately reiterated its ruling that "defendant lacked standing in the motion."

¶ 24    Defendant filed a motion for new trial, in which he alleged, among other things, that the

trial court erred in denying his motion to suppress.

¶ 25    Based on his criminal history, the trial court sentenced defendant as a Class X offender,

and imposed three concurrent 8-year prison terms. The trial court also assessed various fines and

fees, including a $250 DNA fee.

¶ 26                                ANALYSIS

¶ 27                                    I

¶ 28    Defendant's principal argument on appeal is that he had a reasonable expectation of

privacy in Barry's house, where he frequently served as a "caretaker," cleaning the house and

feeding Barry's dog.

¶ 29    As an initial matter, in holding that defendant "lacked standing" as a mere "invitee" in

Barry's house, the trial court mischaracterized the legal inquiry. Because the fourth amendment

confers "personal rights" that may not be "vicariously asserted," there is always a threshold

question "whether the proponent of a motion to suppress is entitled to contest the legality of a

search and seizure." *Rakas v. Illinois*, 439 U.S. 128, 133-34, 140 (1978). But in *Rakas*, the

Supreme Court "dispens[ed] with the rubric of 'standing'" as the framework for this inquiry. *Id.* at 138-40; *People v. Johnson*, 237 Ill. 2d 81, 89 (2010) (following *Rakas*, Illinois Supreme Court "no longer uses the rubric of 'standing' when analyzing fourth amendment claims"); *People v. Pittman*, 211 Ill. 2d 502, 521 (2004) ("we admonish courts against analyzing a legitimate expectation of privacy issue under the rubric of 'standing'"). Whether defendant had "standing" was the wrong question for the trial court to ask.

¶ 30    And whether the question is framed in terms of standing, or, more properly, a reasonable or legitimate expectation of privacy, the trial court could not simply draw a bright line between "invitees" and those who were "residing in the house" at the time. It is well settled that a person may, under certain circumstances, claim a reasonable expectation of privacy in someone else's house. See, *e.g.*, *Minnesota v. Olson*, 495 U.S. 91, 99 (1990) (warrantless entry into home to arrest overnight guest violated guest's fourth-amendment rights); see also *Byrd v. United States*, __ U.S. __, __, 138 S. Ct. 1518, 1527 (2018) ("it is by now well established that a person need not always have a recognized common-law property interest in the place searched to be able to claim a reasonable expectation of privacy in it"). And as the Supreme Court made clear in *Rakas*, 439 U.S. at 143, "arcane distinctions developed in property and tort law between guests, licensees, invitees, and the like, ought not to control" the inquiry into whether a defendant may contest the legality of a search or seizure. The fourth amendment requires a more fact-intensive and nuanced inquiry than the trial court undertook.

¶ 31    To invoke the fourth amendment's exclusionary rule, a defendant carries the burden of demonstrating (1) that he or she personally had an expectation of privacy in the area searched, and (2) that society recognizes that expectation as "legitimate" or "reasonable." *People v. Rosenberg*, 213 Ill. 2d 69, 77 (2004); *Johnson*, 237 Ill. 2d at 90; *Rakas*, 439 U.S. at 140. The

factors we consider in determining whether a defendant's subjective expectation of privacy is reasonable include the defendant's (1) ownership of the property, (2) legitimate presence in the area searched, (3) possessory interest in the area searched or the property seized, (4) prior use of the area searched or property seized, and (5) ability to control or exclude others' use of the property. *Rosenberg*, 213 Ill. 2d at 78. We review this question of law *de novo*. *Id.* at 77.

¶ 32     We first ask whether defendant, "by his conduct, has 'exhibited an actual (subjective) expectation of privacy.'" *People v. Neal*, 109 Ill. 2d 216, 221 (1985) (quoting *Smith v. Maryland*, 442 U.S. 735, 740 (1979)). The question, in other words, is whether defendant "has shown that 'he seeks to preserve [something] as private.'" (Brackets in original.) *Smith*, 442 U.S. at 740 (quoting *Katz v. United States*, 389 U.S. 347, 351, 361 (1967)). In answering this question, "it is useful to consider whether there are objective manifestations of the claimed privacy interest," such as whether defendant availed himself of any feasible or readily available "safeguards" to protect his privacy. *People v. Janis*, 139 Ill. 2d 300, 314 (1990); see, *e.g.*, *People v. Carodine*, 374 Ill. App. 3d 16, 22 (2007) (defendant manifested expectation of privacy by trying to hide his drugs in opaque bag inside dryer vent).

¶ 33     Defendant made little effort to safeguard any claimed expectation of privacy. Officer Pittman testified that defendant let her into Barry's house, where defendant's drugs were sitting on a table in the foyer, a couple of feet from the front door, in full view of anyone who walked in. Defendant denied all of this, but the trial court believed Officer Pittman's testimony, and we have been given no reason to disturb that credibility determination.

¶ 34     The trial court also believed that when the officers returned, they seized the drugs from that same table, not during a full-scale search of the house as defendant testified. Wherever defendant was standing at the time—in the doorway or on the porch—all three officers testified

that the front door was open. Officer Zinchuk testified that he could see the drugs on the table from the doorway. Officer Clemons testified that he could see them from the porch, since the table was immediately to the right of the open door. If the front door was open, defendant clearly exposed the drugs to public view, and that is all but impossible to reconcile with a subjective expectation of privacy in his activities inside Barry's house. Indeed, it is hard to imagine how defendant could have made the drugs *more* visible, more open to public view, while still keeping them inside the house.

¶ 35    Even on the most charitable account—defendant's own—he opened the door "halfway" and talked to the officers when they returned. That might be construed as *some* effort to preserve his privacy—he did not swing the door wide open or invite them in—but it was a minimal effort at best. If defendant truly wanted to preserve his privacy, he could have kept the door closed and simply told them to go away.

¶ 36    In sum, it is not clear that defendant exhibited an expectation of privacy in his activities inside Barry's house at all. And even if he did exhibit *some* such expectation, it was a very slight, attenuated one.

¶ 37    Assuming defendant manifested at least *some* expectation of privacy, he must also show that his expectation was reasonable. Defendant acknowledges that he had neither a property nor a possessory interest in Barry's house. But he argues that the remaining factors—his legitimate presence, prior use, and control over access to the property—suffice to show that his expectation of privacy was reasonable.

¶ 38    First, defendant testified that he had Barry's permission to be in the house, that he was there to clean the house and feed the dog. The State argues that we must reject defendant's testimony because it was not corroborated by other credible evidence. But the trial court never

found that it lacked credibility. In fact, the trial court explicitly based its ruling that defendant "lacked standing" on his testimony "that he cleaned the house three to four times a week." Because the trial court took defendant's testimony on this point at face value, we will do so, too. Defendant was legitimately present in the house.

¶ 39     And the drugs were seized from an area of the property in which defendant clearly had a right of access. See, *e.g.*, *People v. Harre*, 263 Ill. App. 3d 447, 453 (1994) (defendant who had permission to be on grounds for limited purpose of cutting weeds not legitimately present inside house, so he could not challenge search of house). As we have noted, the trial court found that they were seized from a table right next to the front door. In short, defendant was legitimately present in the area from which the drugs were seized. See *Rosenberg*, 213 Ill. 2d at 78.

¶ 40     Second, defendant also testified that he regularly performed housework for Barry and took care of her dog, sometimes as often as three times per week. His prior use of the property thus weighs, to some extent, in favor of finding a reasonable expectation of privacy.

¶ 41     Third, defendant argues that he had the "ability to control or exclude others' use of the property." See *id*. This factor carries significant (albeit not always decisive) weight in the analysis—someone who has the authority to exclude others from property will *usually* have a reasonable expectation of privacy in it. See *Byrd*, 138 S. Ct. at 1527, 1530-31 (citing *Rakas*, 439 U.S. at 144, n.12) (driver in lawful possession and control of rental car *could* have reasonable expectation of privacy in car, even if not listed as authorized driver on rental contract; remanding for lower courts to decide whether in fact he did).

¶ 42     In particular, defendant claims, his "regular use of the home," and his "status as a caretaker," allowed him to control access to Barry's house.

¶ 43    Defendant's "regular use of the home" does not automatically show that he had authority to control access to the premises and exclude others from it. Defendant offers no explanation of this assertion, only a cursory citation to *People v. Alexander*, 272 Ill. App. 3d 698 (1995). In that case, we said that Alexander "presumably had the ability to control or exclude others' use of" a certain garage. *Id*. at 703. The garage was on property that belonged to Alexander's sister, and although Alexander no longer lived there, he still "operated his [auto parts and repair] business out of the garage." *Id.* at 700-03. Thus, he kept his tools in the garage and "was responsible for everything inside it." *Id.* at 702-03.

¶ 44    Alexander's connection to the garage thus ran far deeper than defendant's connection to Barry's house, at least as far as we know from the evidence defendant offered at the hearing. In particular, he did not establish that he had any responsibility for the contents of Barry's house— if there were any—beyond cleaning them. (And feeding the dog, an issue we will discuss separately.) Even less did he establish that he "operated" his own legitimate "business" out of the house.

¶ 45    We do not read *Alexander* to establish a general presumption that anyone who regularly works on a certain property thereby acquires authority to control access to the premises. An old house may have chronically leaky pipes, but the plumber who regularly tends to them does not "presumably" get to decide who can come and go, or on what terms. That kind of authority *may* be granted, either explicitly or by an implicit understanding, but it cannot be inferred just from the *frequency* of one's work on the premises. Here, there was no testimony from defendant or Barry that spoke directly to the scope of his authority over the premises. So a close look at the *nature* of defendant's activities on the property is necessary.

¶ 46    To this end, defendant argues that his "status as a caretaker" buttresses his claim that he had control over access to the house and the right to exclude others from it. Defendant's so-called caretaker function comprised two sets of tasks: general housework, like cleaning up; and taking care of Barry's dog. We take each in turn.

¶ 47    Someone who provides cleaning services, or other similar household services, does not necessarily have any authority to control access to the house, or to exclude others from the house while they are present and working. To be clear, we are not saying that a household-services provider *never* will, but only that there is no bright line to be drawn one way or the other. Thus, defendant needed to explain the specific terms of his arrangement with Barry in enough detail to prove that he had such authority over the house—if in fact he did. But defendant produced very little evidence of this kind.

¶ 48    We know from defendant's own testimony that he was not a full-time housekeeper for Barry, or anything akin to a nanny. He did not spend the better part of his days tending to the house. And there is no evidence that he assumed any significant share of the responsibilities of managing the household.

¶ 49    Defendant would come over every couple of days—for some unknown amount of time— to help clean up. Barry was apparently willing to leave him alone in the house, at least for some amount of time. But for how long? And did someone—Barry or one of her sons—let defendant in, and step out for a quick errand? Or did defendant have the authority to come and go on his own? Defendant never even established that he had his own key to the house. It was defendant's burden to produce the evidence needed to establish a reasonable expectation of privacy. *Johnson*, 237 Ill. 2d at 90; *People v. Martin*, 2017 IL App (1st) 143255, ¶ 18. But we have no idea, from

the evidence he offered, how he accessed the house himself, never mind whether he had any broader authority to control access to it.

¶ 50    But defendant does not put much weight on these tasks. More significant, he says, was taking care of Barry's dog. To discharge these responsibilities, he needed "to access multiple areas of the home," so he could get the dog's food, water, leash, and other supplies. And he needed to control entry and access to the home, so he could take the dog out for a walk.

¶ 51    Given the record that defendant made, we don't know if any of this is even true. We know, from defendant's testimony, that he was responsible for "feeding the dog" and "cleaning out the dog cage." And we know that the cage was in the kitchen, where, according to defendant, he was working when Officer Pittman first knocked on the window. But we *don't* know how many other areas of the house—if any—defendant needed to access. Where was the dog's food and water, if not in the kitchen? Where were the cleaning supplies kept? We will not speculate about these details or assume facts that defendant did not establish at the hearing.

¶ 52    In any event, even if defendant did need to access various rooms of the house, to get cleaning supplies or dog food, that does not show that he had any authority to decide who else could *enter* the house in the first place.

¶ 53    And even if we assume, for the sake of argument, that walking the dog would prove that defendant controlled access to the house, it was still defendant's burden to produce evidence— his own testimony, if nothing else—that he actually performed this task. But defendant never even testified that he took the dog outside. Rather, he testified that the dog had a cage, and that the cage needed to be "clean[ed] out." Defendant did not elaborate, but at the very least, this testimony is consistent with—and perhaps even suggests—that the dog was *not* being taken out

for walks. In short, on the record before us, defendant did not carry his burden of proving that he authority to control access to Barry's house.

¶ 54   The record aside, defendant argues that anyone caring for a pet in the resident's absence has a reasonable expectation of privacy in the resident's house, by virtue of this role alone. Caring for a pet, he says, "is analogous to caring for a dependent child in the resident's absence." And the intermediate courts of (at least) two other states have adopted a categorical rule that a baby-sitter has a reasonable expectation of privacy while working in a home. *People v. Moreno*, 2 Cal. App. 4th 577, 584-88 (1992); *State v. Anonymous*, (1984-1), 40 Conn. Supp. 20, 37 (1984). Defendant asks us to extend this categorical rule to pet-sitters.

¶ 55   Courts that adhere to this rule have grounded it in the "unique features of the baby-sitter role." *Moreno*, 2 Cal. App. 4th at 586. The "normal purpose" of baby-sitting is to "free the parent from the child and the house," by leaving the baby-sitter "in exclusive charge of the child and the premises." *Id.* at 584. By acting *in loco parentis*, the baby-sitter thus assumes "an obligation to protect her charge from harm." *Anonymous*, 40 Conn. Supp. at 37. That obligation, as a matter of "necessity," gives the baby-sitter an "exclusive right" to decide who may or may not come into the house while the parents are away. *Id.*; *Moreno*, 2 Cal. App. 4th at 584. And that right to exclude, in turn, gives rise to a reasonable expectation of privacy.

¶ 56   We have our doubts about this categorical rule, only because in the fourth-amendment context, the Supreme Court has generally abjured bright-line rules in favor of particularized inquiries. (The one exception we can think of is the overnight guest. See *Olson*, 495 U.S. at 98-100.) But we need not, and do not, decide whether this rule should apply to baby-sitters. Even if it should, defendant must show that *pet*-sitting justifies an equally strong and automatic fourth-amendment interest in someone else's house. We hold that it does not.

¶ 57    Nothing against pets—or their "parents." Gone are the days when pets were little more than chattel. Nowadays they are, in many households, more like members of the family. And they have legal interests of their own—interests that require their owners to provide for the animals' care, including when the owners are away from home. See 510 ILCS 70/3 (West 2018) (owner of "companion animal" must provide food, water, shelter, veterinary care, and other necessities, and faces criminal penalties for failure to do so). So for many people, work, travel, or other responsibilities will make pet-sitters a necessity, at least from time to time.

¶ 58    Because pet-sitters thus serve a function that is widely valued by society, they certainly *could* have a reasonable expectation of privacy in the home where the pet lives. See *Rakas*, 439 U.S. at 143, n.12 (expectations of privacy are legitimized by practices and understandings that society recognizes as valuable). But we are not convinced that this is *always* and *automatically* the case, no matter the details of the arrangement.

¶ 59    As far as the fourth amendment is concerned, not all pet-sitters are the same. Some have a greater connection to the property in question than others. Consider this example, at one end of the spectrum: A family goes on vacation and invites a friend to spend as much time in their house as she pleases while they are away. The main purpose of the invitation is to provide care and company for the family's cat (or dog). The family invites the friend to stay overnight if she wishes, to bring her laundry, and to come and go as she pleases. We might say: She is invited to make herself at home. Or: She has the run of the place. These are telling idioms in the fourth-amendment context. For even if the friend does *not* stay overnight, and so does not fall within the rule of *Olson*, 495 U.S. at 98-100, she certainly has a strong claim to a reasonable expectation of privacy in the house. The house, for a time, is all but hers.

¶ 60    At the other end of the spectrum is this example: The family hires a pet-sitting service to provide two half-hour visits per day, to check in on the cat and tend to the cat's basic needs. This is a commercial transaction—the provision of services for money, by someone with no personal ties to the family. That fact alone substantially diminishes the pet-sitter's expectation of privacy in the house. See *Minnesota v. Carter,* 525 U.S. 83, 90-91 (1998) (where a house is "simply a place to do business" among people who have no personal relationship, it is treated as commercial property, with reduced expectation of privacy). So does the limited scope, and the brief duration, of the pet-sitter's visits.

¶ 61    The pet-sitter may have been given a key to the house, but the key was for a limited purpose: to allow the pet-sitter to provide the agreed-upon service. It was not an invitation for the pet-sitter to treat the house as her own. The pet-sitter, entering the house for a limited time and a limited purpose, has not necessarily been granted any general authority over the premises or access to the premises. *That* pet-sitter has little claim to a reasonable expectation of privacy in the house.

¶ 62    Thus, we decline to adopt a bright-line rule that a pet-sitter has authority to exclude others from the house where the pet lives, or, more generally, that the pet-sitter has a reasonable expectation of privacy in the house. These conclusions may or may not follow in any given case. The "pet-sitter" role settles nothing on its own. The details of the arrangement matter.

¶ 63    As we have said, we know little about the terms of defendant's arrangement with Barry. That in itself is a problem for defendant; it was his burden to produce the evidence he needed to show a reasonable expectation of privacy in Barry's house. And the evidence he did produce strongly suggests that the arrangement was more like our second example than the first.

¶ 64    Defendant was providing a service for Barry (though we note that defendant never established that he was paid for his time). There was no evidence that he was ever an overnight guest in the house, or, for that matter, a non-overnight guest who nonetheless spent significant time there. There was no evidence that he had any personal relationship with Barry beyond the arrangement he described in his testimony. There was no evidence that he stored his personal belongings there. His visits had a limited (and seemingly commercial) purpose. And his testimony suggested that they were relatively brief: He testified that when he was arrested, the officers asked whether "somebody [is] going to come here and take care of the dog." Defendant assured them that, "yes, somebody is going to always come here and take care of the dog." If someone else would be around, soon enough, defendant obviously was not expected to spend any significant amount of time caring for the dog.

¶ 65    Perhaps, as defendant says, his responsibilities to feed the dog and clean the dog's cage gave him a second legitimate reason to be in Barry's house, in addition to cleaning. But beyond that, they add little to his privacy interest in the house. In particular, these tasks, on their own, do not show that defendant had any authority to exclude others from the house.

¶ 66    Restricting our analysis to the facts that defendant actually established at the hearing, we find this case to be similar to *People v. Ervin*, 269 Ill. App. 3d 141 (1994). Officers entered the home of Ervin's ex-wife without a warrant, found him packaging cannabis at the kitchen table, and arrested him. *Id.* at 142. Ervin had not lived in the house or spent the night for nearly thirty years, and he did not keep any of his own clothing there. *Id.* at 145. But he visited the house "most every other day" to provide "food and care" to his ex-wife, who suffered from cancer. *Id.* We rejected defendant's argument that his role as a caretaker gave him a reasonable expectation of privacy in his ex-wife's house, finding that his connection to the property was too thin, based

merely on his brief visits to assist his ex-wife, to treat the house as his own for purposes of the fourth amendment. *Id.* at 146-48.

¶ 67 Here, defendant's connection to the house was similar to Ervin's—except that defendant was left alone in Barry's house, for some unknown period of time. But that difference, without more, does not support an inference that defendant had any authority over the premises, or that he had a reasonable expectation of privacy in Barry's house. For the reasons we have given, the record that defendant made at the hearing is too thin to support these conclusions.

¶ 68 In sum, defendant was legitimately present in Barry's house, for the same limited purposes that brought him there on various occasions in the past. But that is all he established at the hearing. Defendant did not carry his burden of establishing a reasonable expectation of privacy. We affirm the denial of his motion to suppress.

¶ 69 II

¶ 70 Lastly, defendant contends that his $250 DNA fee, assessed pursuant to 730 ILCS 5/5-4-3(j), should be vacated. That fee may be imposed only if defendant is not already registered in the DNA databank. *People v. Marshall*, 242 Ill. 2d 285, 301-02 (2011). There is no dispute that defendant was convicted of a prior felony, after the DNA fee went into effect on January 1, 1998. We presume that the circuit court, in that case, required defendant to submit a DNA sample and pay the required fee. *People v. Leach*, 2011 IL App (1st) 090339, ¶¶ 37-38. That presumption, as the State concedes, is sufficient to require vacatur of the fee imposed here. See *id.* We accept the State's concession and vacate defendant's DNA fee.

¶ 71 CONCLUSION

¶ 72 We affirm the denial of defendant's motion to suppress, but we vacate the $250 DNA fee imposed by the circuit court.

- 18 -

No. 1-16-0812

¶ 73    Affirmed in part and vacated in part.